

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-23-2006

# Caushi v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-4506

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Caushi v. Atty Gen USA" (2006). *2006 Decisions*. Paper 1663.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1663

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 04-4506 & 05-3151

ROBERT CAUSHI,

Petitioner

v.

ATTORNEY GENERAL OF
THE UNITED STATES,

Respondent

On Appeal from an Order entered by
The Board of Immigration Appeals
No. A78-821-176

Submitted Under Third Circuit LAR 34.1(a)
November 15, 2005

Before: BARRY and AMBRO, <u>Circuit Judges</u>
POLLAK,[*] <u>District Judge</u>

(Filed January 23, 2006)

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Robert Caushi petitions for review of a decision of the Board of Immigration Appeals ("BIA") denying his motion to reopen and remand his case to the immigration judge ("IJ") and affirming the IJ's decision denying his application for asylum and withholding of removal as well as his request for relief under the Convention Against Torture ("CAT"). Caushi also petitions for review of a later BIA decision denying another motion to reopen. These petitions have been consolidated for review under Immigration and Nationality Act § 242(b)(6), 8 U.S.C. § 1252(b)(6) ("[A]ny review sought of a motion to reopen or reconsider [an] order shall be consolidated with the review of the order."). For the reasons stated below, we grant the first petition and deny the second.

---

[*] Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

2

## I. Facts and Procedural History

### A. Background

Caushi is a young man who is a native and citizen of Albania. He arrived in this country on September 19, 2000 and admitted to an immigration inspector that he was using a fake U.S. passport. In October 2000 the Immigration and Naturalization Service ("INS")[1] served him with a notice to appear for removal proceedings. Caushi conceded removability on the basis of not having a valid entry document but applied for asylum, withholding of removal, and relief under the CAT.

In his asylum application, Caushi asserted that he had been a member of the youth movement of the Democratic Party of Albania ("DP"), a political party that opposed the governing Communist, and later Socialist, parties. He alleged that he had been persecuted in Albania because of his political beliefs. Specifically, he contended that he and his brother-in-law, Dritan Azune, were arrested in May 1998 at a DP rally, and although Caushi was released after a few hours, Azune was detained for three days. Shortly after Azune was released from police custody, he was shot to death by unknown assailants in front of the police station. Caushi also alleged that on September 13,

---

[1] As of March 1, 2003 the INS ceased to exist, and its functions were transferred to the Department of Homeland Security. See 6 U.S.C. § 271.

1998 he was "severely beaten" by police officers at a demonstration in Tirana, Albania's capital, while protesting the assassination of a DP leader, during which he "broke a tooth and sustained other injuries." Caushi stated that he went into hiding after this incident. He further stated that the police came to his family's house looking for him and pointed a gun at his father when they learned he was not there. Caushi also stated that he feared being tortured or killed in Albania on account of his political activities.

### B.  Proceedings Before the Immigration Judge

Caushi appeared before an IJ in April 2002. He testified that he was released from police custody in May 1998 because the police could not verify that he was a member of the DP, but that they knew his brother-in-law was a "high-profile" DP member. With respect to the incident in September 1998, Caushi testified that police started shooting at demonstrators with machine guns and then beat him with a rubber club. He stated he suffered numerous injuries as a result of this beating, including a dislocated disc in his spine and several lacerations on his body and arms that required stitches. Caushi went into hiding in the northern town of Bajram Curri after police officers came to his parents' house, pointed a gun at his father, hit his father on the head with a gun, and threatened to kill the family if they did not say where Caushi was. He further stated that, although his Albanian passport contains two visas indicating travel to Macedonia and Bulgaria during the time he was

4

allegedly in Bajram Curri, those visas are fraudulent and were obtained by his father to "show [the police] that I had left the country and come back."

Caushi next called his sister, Loreta Caushi, to testify. Loreta, who also had an asylum application pending before the immigration court, testified that Caushi and their father were members of the DP, and that she was familiar with "the entire story" of why her brother left Albania, beginning with his arrest in May 1998. Loreta stated that their brother-in-law was murdered a few days after Caushi was released from custody. To her knowledge, Caushi fled to Bajram Curri after the May 1998 incident and attended a DP rally in Tirana in July 1998. She also testified that "[t]he police came several times at our home to look for [my] brother," and on one occasion they "put the machine gun on top of my father's head." She stated that the police said that, if they did not find Caushi, they would kill the family like they killed her brother-in-law. Regarding the September 1998 rally, Loreta asserted that she was at the rally with her brother but did not see him beaten by police. She did state, however, that someone from the DP came to their house and told them that her brother was hurt, "that he had cuts in his body and his hand, and he had broken a tooth." She testified that the next time she saw her brother was when she came to the United States.

Caushi also submitted a hospital report from Albania that indicated he had been treated for contusions on the day of the

September 1998 demonstration and an affidavit from Dr. Josephine Kerr, a licensed pediatrician and volunteer for Doctors of the World, who stated that she examined Caushi and noted several scars on his chest, elbow, knees, and shoulder, as well as tenderness in his back. She also noted that Caushi became "tearful and agitated" when describing the beatings he allegedly suffered at the hands of the Albanian police. In addition to clinical observations of Caushi's condition, Dr. Kerr's report contained a lengthy account of his past history, apparently based solely on his statements, and concluded with an assessment that Caushi "has a real and valid fear of danger to himself if he returns to Albania under the present government rule." Caushi also submitted photographs showing numerous scars on his arms and chest.

Upon the close of evidence, the IJ proceeded to question Caushi regarding the contents of two news articles the IJ obtained from the Internet. The articles — one from CNN and another from the BBC — recounted the violence surrounding the September 13, 1998 demonstration of which Caushi was a part, including a riot by the protesters and counterattacks by the Albanian police and military. The IJ read portions of these articles to Caushi and asked him if they adequately reflected the events of that day, and Caushi responded yes. The IJ did not, however, place the articles in the record.

On April 9, 2002 the IJ decided orally that Caushi was not eligible for asylum, withholding of removal, or relief under

6

the CAT. The IJ found that, while Caushi belonged to the DP youth movement, he was not a "full-blown member" and held no leadership position. The IJ believed Caushi's testimony that he was arrested and briefly detained following the DP demonstration in May 1998, and that he was injured during the "extremely violent" DP demonstration in September 1998 (during which, the IJ found, both Albanian police and demonstrators used force and "the government lost control of the capital city of Tirana for at least a few days"). The IJ noted, however, that the hospital report submitted by Caushi said nothing about him having suffered cuts. The IJ also largely discounted Dr. Kerr's report because, although the doctor "appear[ed] to be well intentioned," her affidavit was mostly "a recitation of the respondent's claim, and even a plea for the truth of the facts concerning the claim," and her "ultimate medical evaluation of the respondent appear[ed] . . . less credible because of the seven pages of previous statement[s] by Dr. Kerr concerning the respondent's asylum claim, compared to one-and-a-half pages of evaluation of the respondent's medical condition." The IJ therefore concluded that, although Caushi had scars on his chest, elbow, and knees, Dr. Kerr was in no position to explain where they came from. The IJ also faulted Dr. Kerr for reporting that the demonstration occurred on September 14, 1998, when in fact it occurred on September 13.

As for Loreta Caushi's testimony, the IJ found her "not . . . at all credible." The IJ commented that she appeared to have "a selective memory" because "when she thought the answers to

7

certain questions would be helpful, she gave specific answers, and other times, she did not answer questions accurately." The IJ did not give any examples in support of this conclusion. The IJ further found that Caushi's testimony that he had gone into hiding in Bajram Curri was not credible because his Albanian passport indicated trips to Macedonia and Bulgaria during that time, and although Caushi testified that his father falsely placed the visa stamps in his passport, he did not provide any indication why his father would have done so. Finally, the IJ found that Caushi's father, "who had been a full-blown member of the Democratic Party for many years," remained in Albania and there was no evidence that he suffered persecution as a result. The IJ therefore concluded that the "isolated incidents" of violence Caushi suffered did not amount to past persecution, and there was no indication that he would be persecuted if he returned to Albania. The IJ therefore denied his application for asylum, withholding of removal, and relief under the CAT.

## C. Proceedings Before the BIA

Caushi appealed to the BIA. He contended that the IJ ignored the evidence that his brother-in-law and fellow DP member, Dritan Azune, was murdered, and that "[t]he present country conditions in Albania are dangerous and unstable" because the Socialist Party remained in power. Caushi also asserted that substantial evidence did not support the IJ's conclusion that his testimony regarding his injuries was exaggerated, and that the IJ erred in concluding that the beatings

8

he sustained at the hands of police were simply a result of aggressive policing in a riot situation and not persecution. Caushi also faulted the IJ for relying on news reports from the Internet that were not part of the record.

While his appeal was pending before the BIA, Caushi filed a motion to reopen seeking a remand to the IJ in light of newly uncovered evidence — to wit, that his sister Loreta had been granted asylum in a separate proceeding after his application was denied. Caushi contended that Loreta's success in obtaining asylum undercut the IJ's determination that Loreta's testimony in his case was not credible.

The BIA denied petitioner's motion to reopen on November 8, 2004, and affirmed the IJ's decision. The BIA concluded that Caushi had not provided any evidence regarding the basis on which Loreta was granted asylum, and therefore there was no evidence that "the facts in [her] claim were similar to his." The BIA also held that the IJ's underlying determination that Caushi had failed to establish evidence of persecution was supported by the record, stating that "the detention and mistreatment of [Caushi] in the course of civil disturbances in 1998 does not constitute past persecution on account of political opinion." Caushi petitioned our Court for review of the BIA's decision.

While his petition for review was pending, Caushi filed another motion to reopen with the BIA. He contended that, although there was no transcript of the IJ's decision in Loreta's case, her asylum application revealed that her claims "stem[] directly from [my] activities." Caushi indicated that his sister had been raped by the police who came to their home looking for him, an incident Loreta had not revealed prior to his hearing because she was ashamed and suffered from post-traumatic stress disorder. Caushi contended that Loreta was granted asylum due to her being "beaten and raped because the authorities were unable to locate [me] at their home. Had [I] been home, she would most likely have been left alone and [I] would have been harmed or killed." Caushi thus argued that the rape and post-traumatic stress disorder, coupled with the fact that another IJ found Loreta credible, constituted newly available evidence that significantly undercut the IJ's conclusion in his case that Loreta had a "selective memory" and therefore was not credible.

On June 1, 2005 the BIA denied as well this motion to reopen. It stated that Loreta's asylum application gave no indication of the actual reasons why she was granted asylum. In the absence of the IJ's oral decision "or any other objective evidence regarding the specifics of the basis of the Immigration Judge's grant of his sister's asylum claim," the BIA concluded that it was unable to determine "whether there is a sufficient nexus between the facts in [Caushi's] case and the facts upon which the Immigration Judge granted his sister asylum."

10

Moreover, the BIA determined that the evidence of Loreta's rape and post-traumatic stress disorder was available to Caushi at the time of his hearing because Loreta had been seeing a psychotherapist for nearly four months and had disclosed the relevant information to her doctor. It therefore concluded that Loreta "could have raised the alleged fact that she was raped, ashamed of her rape, and suffered from post-traumatic stress disorder either before the Immigration Judge [in her brother's case] or in [his] Notice of Appeal [to the BIA]." Caushi petitioned our Court for review of the BIA's denial of this motion to reopen. We consolidated Caushi's petitions pursuant to 8 U.S.C. § 1252(b)(6).

## D. Petitions for Review

Caushi's petitions for review allege error on five grounds. His first petition alleges that the BIA erred in finding that substantial evidence supported the IJ's determination that he had not been persecuted or had a well-founded fear of persecution, and that the BIA erred in not remanding his case to the IJ in light of his sister's subsequent success in gaining asylum. His second petition (which largely subsumes the second claim of error in his first petition) contends that the BIA's conclusion that he did not prove that Loreta's asylum claim was factually related to his own was error; that the BIA further erred in holding that the evidence of Loreta's rape was available to Caushi prior to his hearing; and that, in any event, the grant of asylum to Loreta and her post-traumatic stress

11

disorder are newly available evidence that contradict the IJ's conclusion that she was not credible. For the reasons stated below, we grant the first petition and deny the second.[2]

## II. Jurisdiction and Standard of Review

We have jurisdiction over Caushi's petitions under 8 U.S.C. § 1252, which grants federal courts of appeals jurisdiction to review final orders of the BIA. We review the BIA's affirmance of an IJ's factual findings, including its determination of whether an alien was subject to persecution or has a well-founded fear of persecution, under a substantial evidence standard. See, e.g., Shardar v. Ashcroft, 382 F.3d 318, 323 (3d Cir. 2004). The BIA's affirmance of the IJ's credibility determinations is also reviewed under this standard. See Cao v. Att'y Gen., 407 F.3d 146, 152 (3d Cir. 2005) ("The credibility determination, like all IJ factual findings, is subject to substantial evidence review."). In conducting this analysis we consider the record as a whole and shall reverse only if "'[a] reasonable adjudicator would be compelled to conclude to the contrary.'" Shardar, 382 F.3d at 323 (quoting 8 U.S.C. § 1252(b)(4)(B)). We review the BIA's denial of a motion to reopen for abuse of discretion, Lu v. Ashcroft, 259 F.3d 127, 131 (3d Cir. 2001), and review its underlying factual conclusions related to the motion for substantial evidence.

_____

[2] Caushi has not appealed the IJ's denial of his request for relief under the CAT.

12

Sevoian v. Ashcroft, 290 F.3d 166, 170 (3d Cir. 2002). The BIA's denial of a motion to reopen may only be reversed if it is "arbitrary, irrational, or contrary to law." Id. at 174 (internal quotation marks omitted).

### III. First Petition for Review

We begin with Caushi's first petition for review.[3] In deciding an alien's asylum application, an IJ must consider the complete record, analyzing the evidence both pro and con. See Gao v. Ashcroft, 299 F.3d 266, 277 (3d Cir. 2002). Although our review of an IJ's credibility determinations is deferential, "that deference is expressly conditioned on support in the record, and [d]eference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record." Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003) (en banc) (citation and internal quotation marks omitted; alteration in original). An IJ must support his factual determinations with "specific, cogent" reasons such that his conclusions "flow in a reasoned way from the evidence of record and are [not] arbitrary and conjectural in nature." Id. at 250. Failure to do so "does not pass muster under the substantial evidence rubric." Id. at 254 (citing Mulanga v. Ashcroft, 349 F.3d 123 (3d Cir. 2003)).

---

[3] Insofar as Caushi's first petition challenges the BIA's denial of his motion to reopen and remand, we address that issue in Part IV below.

13

## A. IJ's Factual Conclusions Related to Persecution

We have several problems with the IJ's factual conclusions in this case. First, he found that the adverse treatment Caushi claimed to have suffered did not amount to past persecution and did not create a well-founded fear of future persecution. In reaching this conclusion, the IJ did not even mention the testimony that Caushi's brother-in-law, with whom Caushi was arrested at a DP rally in May 1998, was shot to death in front of the police station minutes after being released from custody, and the further testimony of Caushi and his sister that police officers essentially claimed responsibility for the murder when they raided the Caushis' house looking for him. The IJ also believed that Caushi had been beaten at the September 1998 demonstration, but rejected his testimony that he was also slashed because, despite the fact that Caushi's arms and torso are covered with scars, the report from the hospital in Albania where he was taken following the beating did not mention any cuts. The IJ did not address Caushi's explanation for this omission (i.e., that medical documents in Albania "are not . . . very clear in what they state") or his testimony that, in any event, his cuts were treated by a private doctor at his sister's home and not at the hospital. See, e.g., Campos-Sanchez v. INS, 164 F.3d 448, 450 (9th Cir. 1999) (requiring the BIA to consider an alien's explanations for any perceived inconsistencies in his testimony before deciding upon the alien's credibility). The IJ also did not address the fact that Dr. Kerr noted that Caushi had several "well healed" scars on his body

14

and prosthetic front teeth, even though both observations are consistent with Caushi's description of his injuries.[4]

We are also puzzled by the IJ's finding that Caushi "did nothing that would bring himself to the attention of the authorities." The IJ supported this conclusion by noting that Caushi "was a member of the youth branch of the Democratic Party, [and] was not a full-blown member." The IJ's finding is at odds with his determination that Caushi's father was an active member of the DP and that Caushi was arrested in May 1998 because of his affiliation with that party. Moreover, the conclusion is belied by the fact (unmentioned by the IJ) that Caushi's brother-in-law was a high-level DP member who was murdered immediately after he was released from police custody, and the unrebutted testimony of Caushi and his sister

---

[4] Although we agree with the IJ's decision to reject Dr. Kerr's inappropriate conclusions regarding Caushi's factual background, we do not believe this necessarily renders her medical examination not credible, especially since Caushi provided photographs of his scars so that the IJ could inspect the physical evidence for himself. Also of concern is the great weight the IJ gave to the fact that Dr. Kerr listed the date of the September 1998 DP demonstration as September 14 rather than September 13 in making his credibility determination. Dr. Kerr's error is, at most, a minor inconsistency that is irrelevant to the substance of Caushi's asylum claim, and therefore should not form a basis for an adverse credibility determination. See Berishaj v. Ashcroft, 378 F.3d 314, 323 (3d Cir. 2004).

15

that the police came to their house looking for him and assaulted his family shortly after his participation in the September 1998 demonstration at which he was beaten. In short, the IJ's conclusion that Caushi was somehow unknown to the police (despite the fact his family was well known and Caushi himself had been arrested) is unsupported by the record.

We believe these omissions from the IJ's factual discussion are significant because the omitted evidence tends to establish past persecution. We have defined persecution as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." See Li v. Att'y Gen., 400 F.3d 157, 167 (3d Cir. 2005) (citation and internal quotation marks omitted). The conduct Caushi alleges — the murder of his brother-in-law, the beating and alleged slashing at the hands of police, the threats against his family, and the violence, intimidation, and assassinations directed at the DP — tends to establish a threat to life and freedom. The IJ's failure to give specific, cogent reasons for rejecting these allegations in light of all of the record evidence falls significantly short of the requirement that his factual findings be supported by substantial evidence.

B. IJ's Determination That Loreta Caushi Was Not Credible

Next, we consider the IJ's determination that Caushi's sister Loreta was "not . . . at all credible" when she testified in support of her brother's allegations of persecution. The IJ's

16

entire analysis of her testimony is as follows: "I did not find her testimony at all credible. I thought that she had a selective memory. When she thought the answers to certain questions would be helpful, she gave specific answers, and other times, she did not answer questions accurately." The IJ did not point to any specific instances in which Loreta gave inaccurate or selective testimony; indeed, he did not provide <u>any</u> explanation of how he arrived at this conclusion. As we stated above, it is well established that an IJ must support his credibility determinations with record evidence and provide "specific, cogent" reasons for his conclusions sufficient to demonstrate that they are not "arbitrary and conjectural in nature." <u>Dia</u>, 353 F.3d at 250. By not citing a single instance in which Loreta's testimony was inaccurate or selective, the IJ did not satisfy this standard.

Moreover, our review of Loreta's testimony reveals very few instances in which her statements were demonstrably inaccurate, vague, or nonresponsive. For the most part, her testimony was clear and consistent, and corroborated her brother's account. We note only three instances where the judge expressed dissatisfaction with Loreta's responsiveness:

> [IJ, regarding the May 1998 demonstration:] Did you see Robert and your brother-in-law being arrested?

17

[Loreta:] No.

[IJ:] When Robert was released, he told you he had been arrested? Ms. Caushi, I'm sorry, I just want you to answer the questions as directly as possible. When Robert was released, did he tell you he had been arrested?

[Loreta:] Yes.

[IJ:] How long did he tell you he had been detained?

[Loreta:] He told me he was detained for like three hours.

. . .

[Loreta, regarding another demonstration in July 1998:] I remember that on the 4th of July, my brother participated [i]n a rally of the Democratic Party, and there was an assassination from the Socialist Party that day.

[IJ:] What year?

18

[Loreta:] '98.   About 150 bullets were shot, and Azem Hajdari [a DP leader] was there, and the police shot over the people.

[IJ:] What was, what was the date again?

[Loreta:] It was 4th of July.

[IJ:] July 4, 1998?   Ms. Caushi, you have to try to just answer the question as directly as possible.   The incident you're talking about occurred on July 4, 1998, yes or no?

[Loreta:] Yes.

[IJ:] Was your brother hurt on July 4, 1998, or arrested, your brother, Robert?

[Loreta:]   No,   nothing happened.
. . .

[IJ, regarding the police

19

search for Caushi at his family's house:] Did the police say why they wanted to talk to your brother, Robert? Yes or no.

[Loreta:] Yes.

[IJ:] What did they say? Why did they say they wanted to talk to Robert?

[Loreta:] Because the police in Albania, they knew that my brother was a member of the Youth Forum for [the] Democratic Party, and he support[ed] Azem Hajdari in the Democratic Party, so they tried the best they could to stop this, this wave of new Democrats.

[IJ:] Is that what the police said? Is that what they said when they came to your house several times?

[Loreta:] No, they didn't say that, but they said to my father that we want your son.

20

[IJ:] Did they say, did they say — listen to my words. Did they say why they wanted to talk to your brother?

[Loreta:] They never would tell us the reason why they wanted to talk to my brother, but I remember them telling to my father in front of me and my mother that if you don't tell us where your son is, then we will find him and we will kill him the same way we killed your brother-in-law.

With respect to the exchanges related to the May and July demonstrations, we are perplexed by the IJ's apparent displeasure with Loreta's responses because the transcript reveals that Loreta directly answered all of the IJ's questions. As for the exchange regarding the police officers' search for Caushi, we agree that Loreta did not directly answer the IJ's question, "Why did [the police] say they wanted to talk to Robert?", but rather gave her view of why the police were interested in her brother. When the IJ repeated his question, however, Loreta directly answered it and stated that the police never said why they were looking for her brother. Especially since Loreta was testifying via an interpreter, and therefore it is unsurprising that some questions may have been misunderstood

21

and repetitions may have been necessary, we do not believe Loreta's failure to answer directly the IJ's question on the first try is sufficient for a reasonable adjudicator to conclude that she was not credible.

The Government places particular reliance on another exchange that occurred during cross-examination as evidence that Loreta's testimony was evasive and inaccurate:

> [Government:] Do, do you have an Albanian passport?
>
> [Loreta:] Yes. That's the one I've traveled with.
>
> [Government:] Okay. When did you get it?
>
> [Loreta:] It's my passport.
>
> [Government:] When did you get it?
>
> [Loreta:] My, my father obtained the passport for me and some, some relatives of my sister managed to get the visa.

22

[Government:] One more time. When did you get the passport?

[Loreta:] The date I came here, 9:00 in the morning, was the day that I obtained the passport.

[Government:] How did you get it?

[Loreta:] On June, June 5.

[Government, to the IJ:] I don't know how to ask these questions any more simply.

[IJ, to Loreta:] Did you get the Albanian passport while you were here in the United States?

[Loreta:] In Albania.

[IJ:] Do you remember the date that you got your Albanian passport, what year?

[Loreta:] I don't remember.

23

I'm sorry, I don't remember.

[IJ:] You don't remember —

[Loreta:] It's [a] five-year passport. It's a five-year passport. I don't know when it expires.

[IJ:] I'm asking you when it was issued, what year it was issued to you, '98, '99, 2000, 2001; what year was the passport issued to you?

[Loreta:] It's difficult to remember when it was issued, '93, '94. I'm not sure.

We agree with the Government that Loreta's responses in this exchange were not initially responsive to the questions asked. Nonetheless, Loreta answered the questions upon rephrasing by the IJ. In any event, Loreta's failure to recall the precise date on which her passport was issued is, at best, tangential to her brother's asylum claim. We have stated that "minor inconsistencies and minor admissions that reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding. [Rather,] [t]he discrepancies must involve the heart of the asylum claim."

24

Berishaj v. Ashcroft, 378 F.3d 314, 323 (3d Cir. 2004) (citation and internal quotation marks omitted).[5] We are not persuaded that Loreta's failure to recall the date her passport was issued, and her initial failure to answer directly the Government's questions regarding the passport, reveal anything about the credibility of her testimony regarding her brother's treatment.

## C.  Summary

We grant Caushi's first petition for review, vacate the BIA's November 8, 2004 order insofar as it affirmed the IJ's oral decision, and remand this case to the BIA so that it can refer the case to the IJ for further proceedings consistent with this opinion.  We base this decision on two sets of errors.  First, the IJ's factual determinations related to Caushi's eligibility for asylum are not supported by substantial evidence.  As noted, in

---

[5]  The REAL ID Act of 2005 changes the standards governing credibility determinations, stating that such determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Pub. L. 109-13, div. B, § 101(a)(3), 119 Stat. 231, 303 (to be codified at 8 U.S.C. § 1158(b)(1)(B)(iii)).  We note, however, that this provision only applies to aliens who applied for asylum, withholding of removal, or other relief after May 11, 2005, the effective date of the Act.  See id. § 101(h)(2), 119 Stat. at 305.  Since Caushi applied for asylum in January 2001, this provision is inapplicable to our review of his claim.

25

his oral decision the IJ never mentioned that Caushi's brother-in-law, a fellow member of the DP with whom Caushi was arrested in May 1998, was murdered immediately after he was released from police custody. In addition, although the IJ believed Caushi's testimony that he had been beaten by police at a rally in September 1998, the IJ rejected his testimony that he had been slashed despite the fact that Caushi's arms and torso are covered with scars and he has prosthetic front teeth, which are consistent with Caushi's description of his injuries. The IJ relied on the fact that the report from the hospital in Albania where Caushi was taken following the beating did not mention any cuts, but the IJ did not mention Caushi's explanation for this omission (i.e., that medical documents in Albania "are not . . . very clear in what they state") or his testimony that, in any event, his cuts were treated by a private doctor at his sister's home and not at the hospital. Moreover, the IJ's conclusion that Caushi "did nothing that would bring himself to the attention of the authorities" because he "was a member of the youth branch of the Democratic Party, [and] was not a full-blown member" is unsupported by the record and, indeed, is contradicted by the fact that his family was well known to the police because of Caushi's father's and brother-in-law's activities in the DP and the fact that Caushi himself had been arrested.

Second, the IJ's conclusion that Loreta Caushi's testimony at her brother's hearing was selective and inaccurate (and therefore not credible) is unsupported by any explanation or citation to specific instances where her testimony was

26

deficient. Moreover, we cannot identify a single instance where Loreta's testimony about events at the heart of her brother's asylum claim was demonstrably inaccurate, selective, or evasive. Thus, we conclude that the IJ's adverse credibility determination is not supported by substantial evidence.

We acknowledge, of course, that the record contains some evidence that weighs against Caushi's credibility (such as the fact his parents remain in Albania or the inconsistency between his alleged flight to Bajram Curri and the visa stamps in his passport indicating travel to Macedonia and Bulgaria during that time).[6] We express no opinion on how this evidence

---

[6] The Government places particular reliance on the U.S. State Department Profile of Asylum Claims for Albania, produced in May 2001 for use by the Executive Office of Immigration Review. This report makes several broad statements, including that "[t]here is virtually no evidence that individuals are targeted for mistreatment on political grounds," "[t]here is no post-Communist tradition of retribution against political leaders and few instances thereof," and "[t]he Government has neither the means nor the will to carry out systematic persecution." We note, however, that these conclusions are at odds with the State Department's 2000 and 2001 Country Reports for Albania (which we have described as "the 'most appropriate' and 'perhaps best resource' on country conditions," Ambartsoumian v. Ashcroft, 388 F.3d 85, 89 (3d Cir. 2004) (quoting Lal v. INS, 255 F.3d 998, 1023 (9th Cir. 2001))), which cite numerous allegations of violence and

27

should influence Caushi's eligibility for asylum because such a determination must be made by the immigration court in the first instance. See INS v. Ventura, 537 U.S. 12, 16-17 (2002). On remand, the IJ must carefully examine the complete record in a manner consistent with this opinion and determine whether, on balance, the evidence supports Caushi's eligibility for asylum.[7]

intimidation directed at DP members that often went uninvestigated and unpunished. We are not, therefore, persuaded that the Asylum Profile is proof that Caushi's claims lack merit.

[7] We also note that, although an IJ may introduce evidence into the record, see Mulanga, 349 F.3d at 135 (quoting In re S-M-J-, 21 I. & N. Dec. 722, 726 (B.I.A. 1997)), "[when] the Immigration Judge relies on the country conditions in adjudicating the alien's case, the source of the Immigration Judge's knowledge of the particular country must be made part of the record," S-M-J-, 21 I. & N. Dec. at 727. Here, the IJ relied on Internet articles from CNN and the BBC as evidence of the events that took place in Tirana on September 13, 1998. Although the IJ may introduce evidence sua sponte, and therefore the IJ's reliance on these articles was not error, we agree with Caushi that the IJ inappropriately neglected to place the complete articles in the record. If, upon remand, the BIA wishes to rely on these articles or any other evidence, such evidence must be placed in the record.

28

## IV. Second Petition for Review

We turn now to Caushi's second petition for review, and consider his first petition insofar as he contends that the BIA erred in denying his motion to reopen and remand. A motion to reopen may be denied if the BIA determines that: (1) the alien has not established a prima facie case for the relief sought; (2) the alien "has not introduced previously unavailable, material evidence"; or (3) in the case of discretionary relief (such as asylum), the alien would not be entitled to relief even if the motion was granted. INS v. Abudu, 485 U.S. 94, 104-05 (1988); Sevoian, 290 F.3d at 169-70; see also 8 C.F.R. § 1003.2(c)(1) ("A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . ."). The BIA denied Caushi's motions to reopen because he did not prove a nexus between his claim and Loreta's. The BIA also denied the first motion because Caushi did not address the reasons why the IJ in his case found Loreta not credible, and denied the second motion because it did not present any evidence that was not available to him at the time of his hearing.

We do not believe the BIA abused its discretion in denying these motions. In his first motion to reopen, which sought a remand to the IJ in light of Loreta's subsequent success in obtaining asylum, Caushi did not discuss any of the reasons why Loreta was granted asylum and therefore failed to establish

29

that her subsequent case had any bearing on the IJ's conclusion in Caushi's case that Loreta lacked credibility. Indeed, the only evidence accompanying Caushi's motion was an affidavit from his attorney stating conclusorily that Loreta's grant of asylum "clearly contradicts the finding of the other Immigration Judge who did not find her to be credible." The motion offered no evidence that Loreta obtained asylum based on the same testimony she gave before the IJ in Caushi's case; indeed, there was no indication whatever that Loreta gained asylum for reasons that were at all related to her brother's claim. The BIA rightly concluded that the mere fact Loreta was granted asylum after testifying at her brother's hearing was not, without more, evidence that the IJ's adverse credibility determination in her brother's case was erroneous.

Caushi attempted to remedy these defects in his second motion to reopen. He attached several exhibits, including his sister's asylum application; an affidavit from his sister's doctor stating that Loreta has post-traumatic stress disorder; and an affidavit from Loreta stating that she did not tell her brother about the rape because she was "ashamed and traumatized," and did not testify about it at his hearing because she was not asked, but was able to testify about it at her own asylum hearing and was "now able to tell the entire story" and "would be more than willing to testify on Robert's behalf" if he was granted a new hearing.

30

## A.  The Rape

First, Caushi contends that the police officers who came to his family's home looking for him raped Loreta, and this tends to establish that he and his family have suffered past persecution and have a well-founded fear of future persecution. We note, however, that Caushi certainly knew about the rape well in advance of his April 2002 hearing before the IJ.  His elder sister, Andoneta Zherka, submitted an affidavit in support of his asylum application in December 2001 stating that Loreta had been raped by a police officer who came looking for Caushi, and Caushi himself mentioned in his testimony before the IJ that he heard "from my youngest sister who got raped . . . that a lot of things happened with my family."  The rape was therefore known to Caushi at the time of his hearing and the BIA correctly determined that the evidence "could . . . have been discovered or presented at the former hearing," 8 C.F.R. § 1003.2(c)(1), and was therefore not properly raised in a motion to reopen.

## B.  Post-Traumatic Stress Disorder

Petitioner also contends that the diagnosis of Loreta's post-traumatic stress disorder is newly available evidence that bears on the credibility of her testimony before the IJ in his case — specifically, her "selective memory" — and therefore seeks reopening so that the IJ may consider this new evidence.  The BIA rejected this argument, holding that Loreta's doctor was treating her for post-traumatic stress disorder at the time of her

31

brother's hearing and therefore she could have discussed it in her testimony. While we are skeptical of this reasoning (primarily because there is no evidence that Caushi had any reason to know of the private conversations between his sister and her doctor), we have no cause to reach this issue. We have already held that the IJ's adverse credibility determination with respect to Loreta's testimony is not supported by substantial evidence, and therefore Caushi has no need to introduce the post-traumatic stress disorder diagnosis as an explanation for Loreta's supposed selective memory.

## C. Subsequent Grant of Asylum

We also find it unnecessary to consider whether Caushi's case should be reopened so that Loreta's asylum grant can be considered by the IJ in assessing her credibility. Again, since we have found that the IJ's adverse credibility determination is not supported by substantial evidence, we decline to address this issue.

## V. Conclusion

For the reasons stated above, we grant Caushi's first petition for review, vacate the BIA's November 8, 2004 order insofar as it affirmed the IJ's oral decision, and remand this case to the BIA with instructions to refer the case to the IJ for further proceedings consistent with this opinion. We deny the second petition for review.