

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-31-2006

# Chen v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4685

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Chen v. Atty Gen USA" (2006). *2006 Decisions*. Paper 1697.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1697

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-4685

JUAN CHEN;
ZHONG RONG YANG,

Petitioners

v.

*ALBERTO R. GONZALES, ATTORNEY
GENERAL OF THE UNITED STATES

Respondent

*Substituted pursuant to Rule 43c, F.R.A.P.

On Petition for Review of an Order of
the Board of Immigration Appeals
(Nos. A77-958-135 & A79-308-176)

Submitted Under Third Circuit LAR 34.1(a)
January 12, 2006

Before: BARRY,  AMBRO and ALDISERT, Circuit Judges

(Filed January 31, 2006)

OPINION

AMBRO, Circuit Judge

Juan Chen and Zhong Rong Yang — wife and husband, respectively — petition for review of a decision of the Board of Immigration Appeals ("BIA") affirming a decision of the Immigration Judge ("IJ") that denied Chen's application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").[1] She contends that the BIA erred in concluding that she had not suffered past persecution and did not have a well-founded fear of future persecution due to China's restrictive family planning policies. For the reasons noted below, we grant the petition.

## I. Facts and Procedural History[2]

Chen, a citizen of the People's Republic of China, entered the United States in June 2001 without a valid entry document. She was interviewed by an officer of the

---

[1] Yang abandoned his independent asylum application before the IJ and seeks asylum or withholding of removal as a consequence of (or, put another way, derived from) his wife's application. Therefore, this opinion shall refer to Chen's claims only, although the derivative nature of Yang's application renders our discussion applicable equally to him.

[2] We note that the petitioners' brief does not contain a statement of facts as required by Fed. R. App. P. 28(a)(7) (stating that an appellant's brief must contain "a statement of facts relevant to the issues submitted for review with appropriate references to the record") and Third Circuit LAR 28.1(a) (incorporating the requirements of Fed. R. App. P. 28). Petitioner's counsel is admonished to note that, in the future, briefs submitted to this Court that do not comply with the requirements of the aforementioned rules may be stricken and the appeal dismissed. See, e.g., Kushner v. Winterthur Swiss Ins. Co., 620 F.2d 404, 407 (3d Cir. 1980) (noting that "counsels' refusal, failure or unwillingness to master our procedures will necessarily result in the imposition of appropriate sanctions" and dismissing the appeal due to a nonconforming appendix).

2

Immigration and Naturalization Service ("INS")[3] upon her arrival. Chen claimed that she

fled China due to its restrictive family planning policies. She was placed in removal

proceedings by a notice to appear dated June 13, 2001. In July 2001 she filed an

application for asylum and withholding of removal, and later requested additional relief

under the CAT.

### A.    Hearings Before the IJ

Chen testified before the IJ on July 15, 2003 and repeated the relevant allegations

contained in her asylum application. She began by stating that the reason for her claim

was that she had been forcibly sterilized but, upon further questioning by the IJ, stated

that she "didn't mean to say" that she had been sterilized but rather that she underwent an

abortion. She testified that she became pregnant with her first child, a daughter, in 1993,

but could not remember the month. According to Chen, three months after her first child

was born, family planning officials forced her to insert an intrauterine device ("IUD"),

but that IUD "fell out" and another one was inserted in September 1996 after the lost IUD

was discovered during a routine medical examination. She testified that the second IUD

"wasn't successful," and in April 1997 she learned she was pregnant again. She also

stated that, upon learning of her pregnancy, she surmised that the second IUD must have

fallen out, but did not know precisely when this occurred.

Chen testified that, upon learning she was pregnant, she was "afraid that [the

---

[3] As of March 1, 2003 the INS ceased to exist, and its functions were transferred to the Department of Homeland Security. See 6 U.S.C. § 271.

family planning officials] would discover my pregnancy and force me to . . . undergo an abortion." She and Yang thus fled to Fuzhou in April 1997, leaving their daughter in the care of Yang's parents. She testified that she returned to her home four months later to visit her daughter and was accosted by five officials who took her to a hospital and "insert[ed] a needle . . . [i]n my belly." Chen stated that she began to feel intense pain and "within two or three hours the fetus had c[o]me out." After the abortion, officials visited her house "every few days" and threatened her with sterilization. As a result of these threats, Chen and Yang again left their daughter in the care of Yang's parents and returned to Fuzhou in August 1997. They left for the United States in 2001.[4]

On cross-examination, Chen stated that for the four years she lived in Fuzhou after the forced abortion, she and Yang did not return to her village to visit their daughter because she "was afraid that if I . . . would be discovered by the officials I would be forced to undergo a sterilization," and that she did not bring her daughter with her to Fuzhou because "I escape[d] and I was on the run and I . . . had to move from place to place." She admitted, however, that she had steady work as a nanny and babysitter in Fuzhou during this time. She also stated that she waited until June 2001 to come to the United States because Yang came to this country first and she "was waiting for my

---

[4] Yang arrived in the United States before Chen and filed an application for asylum and withholding of removal in March 2001, in which he contended that he had suffered persecution in China on account of his religious beliefs. He did not mention the alleged forced abortion and threats of sterilization suffered by his wife. At a hearing before the IJ on July 2, 2002, Yang withdrew his application and sought asylum and withholding of removal based solely on his wife's claims.

4

husband to . . . stabilize in America."

The Government then called Yang to testify. Yang stated that he did not include his wife's experiences in his prior asylum application because his prior attorney advised him that he "didn't have personal experience" with those incidents and "it was better for my wife to tell her own story." He also testified that he did not inform the INS asylum officer of his wife's abortion when he was interviewed because "I was mainly concern[ed] about my case" and "I didn't have the time . . . to go into detail."

**B.** **IJ's Oral Decision**

At the close of testimony, the IJ issued an oral decision denying Chen's application for asylum, withholding of removal, and withholding under the CAT. He also denied Yang's derivative application. The IJ concluded that Chen's testimony was "conjured up and fabricated . . . just to present to this Court," and that her application was therefore frivolous. Specifically, he found that Chen's initial confusion regarding whether she was sterilized or forced to undergo an abortion in 1997 rendered her testimony not credible. He also faulted Chen for allegedly equivocating on when the first IUD fell out, finding that Chen "changed her testimony" by first stating that she discovered it had fallen out in April 1997 when she learned she was pregnant, and then stating that, in fact, the failure of the IUD was discovered in a 1996 medical exam. Moreover, the IJ concluded that it was "extremely difficult to believe" that Chen would not remember the date she became pregnant with her first child, and therefore concluded that, "rather than these events

5

actually happening to [Chen]," she had "memorized this testimony and consequently that calls for the confusion when she was getting her facts backwards."

The IJ also concluded that Chen's testimony that she was afraid to return to her village between 1997 and 2001, and instead was hiding in Fuzhou, "ma[de] absolutely no sense" because there was no evidence that Chen violated any birth control laws during that time and thus "she would not have a verifiable fear of being sterilized."

As for Yang's testimony, the IJ found that it "ma[de] absolutely no sense" that Yang would not have mentioned his wife's alleged violations of China's family planning laws in his asylum application, and that his testimony that his attorney at the time advised him to list only his personal experiences was not credible because "his attorney . . . would know that if indeed his wife had undergone an abortion, this would positively affect [Yang's] application." The IJ also faulted Yang for not revealing this information to the INS asylum officer at his initial interview, concluding that "the first words out of [Yang's] mouth to the asylum officer surely would be relating to the problems that his wife had."

The IJ thus found that Chen and Yang had not testified credibly about past persecution or a well-founded fear of future persecution, and therefore denied the applications for asylum and withholding of removal. He also concluded that there was no evidence in the record that the petitioners risked torture if removed to China, and therefore denied their requests for withholding under the CAT.

**C.    Proceedings Before the BIA**

Chen and Yang appealed to the BIA, arguing that the IJ's credibility determinations were not supported by substantial evidence and that the IJ erred in deeming their applications frivolous.  In its decision, the BIA vacated the IJ's finding that the applications were frivolous but affirmed the rest of his decision.  It noted Chen's apparent confusion over whether she was sterilized or compelled to have an abortion in 1997, and Yang's failure to mention Chen's experiences in his INS interview and asylum application, and concluded that Chen and Yang "have [not] addressed these matters, either before the Immigration Judge or on appeal, in a manner that would support a finding that the Immigration Judge's ensuing adverse credibility findings were clearly erroneous."  Chen and Yang then petitioned for review to our Court.

## II.  Jurisdiction and Standard of Review

We have jurisdiction over this petition under 8 U.S.C. §1252, which grants federal courts of appeals jurisdiction to review final orders of the BIA.  We review the BIA's affirmance of an IJ's factual findings, including its determination of whether an alien was subject to persecution or has a well-founded fear of persecution, under a substantial evidence standard.  See, e.g., Shardar v. Ashcroft, 382 F.3d 318, 323 (3d Cir. 2004).  The BIA's affirmance of the IJ's credibility determinations is also reviewed under this standard.  See Cao v. Att'y Gen., 407 F.3d 146, 152 (3d Cir. 2005) ("The credibility determination, like all IJ factual findings, is subject to substantial evidence review.").

7

Although substantial evidence review is deferential — under which we may reverse only if "'[a] reasonable adjudicator would be compelled to conclude to the contrary,'" Shardar, 382 F.3d at 323 (quoting 8 U.S.C. § 1252(b)(4)(B)) — "that deference is expressly conditioned on support in the record, and [d]eference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record." Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003) (en banc) (citation and internal quotation marks omitted; alteration in original); see Caushi v. Att'y Gen., __ F.3d __, 2006 WL 156829, at *5 (3d Cir. Jan. 23, 2006) (same). An IJ must support his factual determinations with "specific, cogent" reasons such that his conclusions "flow in a reasoned way from the evidence of record and are [not] arbitrary and conjectural in nature." Dia, 353 F.3d at 250; see Caushi, 2006 WL 156829, at *5 (same). Failure to do so "does not pass muster under the substantial evidence rubric." Dia, 353 F.3d at 254 (citing Mulanga v. Ashcroft, 349 F.3d 123 (3d Cir. 2003)).

In addressing perceived inconsistencies in an alien's testimony, the IJ and BIA must consider the alien's explanations for such inconsistencies. See Campos-Sanchez v. INS, 164 F.3d 448, 450 (9th Cir. 1999). Moreover, "minor inconsistencies and minor admissions that reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding. [Rather,] [t]he discrepancies must involve the heart of the asylum claim." Berishaj v. Ashcroft, 378 F.3d 314, 323 (3d Cir.

8

2004) (citation and internal quotation marks omitted).[5]

### III. Analysis

With these principles in mind, we turn to the petition for review. At the outset, we note that the petitioners' brief is not a model of clarity. We have difficulty discerning whether Chen and Yang mean to challenge the BIA's affirmance of the IJ's credibility determinations or if they rest their argument solely on the fact, undisputed by the Government, that the adverse treatment Chen claims to have suffered, if true, would amount to past persecution. See 8 U.S.C. § 1101(a)(42) ("[A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion.") We conclude, however, that the problems with several of the IJ's

_____

[5] In Caushi, we noted:

> The REAL ID Act of 2005 changes the standards governing credibility determinations, stating that such determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Pub. L. 109-13, div. B, § 101(a)(3), 119 Stat. 231, 303 (to be codified at 8 U.S.C. § 1158(b)(1)(B)(iii)). We note, however, that this provision only applies to aliens who applied for asylum, withholding of removal, or other relief after May 11, 2005, the effective date of the Act. See id. § 101(h)(2), 119 Stat. at 305.

Caushi, 2006 WL 156829, at *8 n.5. Since Chen applied for asylum in July 2001, the provisions of REAL ID Act § 101(a)(3) are inapplicable to our review of her claim.

9

credibility determinations are so glaring that it would be manifestly unjust if we were to let them pass without comment. See, e.g., McCarthy v. SEC, 406 F.3d 179, 186 (2d Cir. 2005) ("We are inclined to overlook a party's failure to properly raise an issue on appeal if manifest injustice would otherwise result.").

A.      **Testimony Regarding IUDs**

Chen testified that, three months after her first child was born, family planning officials forced her to insert an IUD. According to Chen, the IUD "fell out" and, after this was discovered during a routine medical examination in September 1996, another one was inserted. Chen stated that the second IUD "wasn't successful" and she discovered that it, too, had fallen out when she learned she was pregnant in April 1997. Chen's account is clearly set forth in her testimony:

> [Chen's Counsel:]  Did you only have one IUD insertion?
> [Chen:]  Two times.
> [Chen's Counsel:]  Why the second time?
> [Chen:]  Because, because the first one fell out.  After the, after the periodical checkups they discover[ed] that it fell out and they insert[ed] another one in there.
> [Chen's Counsel:]  How often were the periodical checkups?
> [Chen:]  Every four — once every four months.
> [Chen's Counsel:]  And when did they discover that it fell out?
> [Chen:]  In '96.
> [Chen's Counsel:]  So what did they do after they discovered it, it fell out?
> [Chen:]  They examine[d] me and then they reinsert[ed] another IUD.
> [Chen's Counsel:]  And was that, was that IUD

10

successfully inserted?

    [Chen:]  Eventually it, it wasn't successful.

The IJ apparently misunderstood this testimony, because he then initiated the following exchange:

> [IJ:]  When was the second IUD inserted?
> [Chen:]  In September of '96.
> [IJ:]  And when was it discovered that it had fallen out?
> [Chen:]  I discover[ed] that it fell out after I discover[ed] my pregnancy.
> [IJ:]  When would that have been?
> [Chen:]  When I discover[ed] my pregnancy it was in April.
> [IJ:]  Of what year?
> [Chen:]  '97.
> [IJ:]  That doesn't make any sense.  You said that they inserted the, the second IUD when they noticed the first one fell out, right?
> [Chen:]  Yes.
> [IJ:]  And you said they inserted the second IUD in September of 1996.
> [Chen:]  Yes, September of '96.
> [IJ:]  Okay.  And then you said — I asked you when you — when they noticed it fell out to replace it and you said it was April of '97.
> [Chen:]  '97 was my pregnancy.
> [IJ:]  What — you, you said that — I just asked you when, when they noticed it fell out and you said they noticed it fell out in April of '97 when they noticed that you were pregnant.
> [Chen:]  On April of '97 I knew — I discovered that I was pregnant.  I didn't know when exact — I didn't know exactly when the IUD had fallen out.
> [IJ:]  That's fine, but you have, you have them reinserting the IUD in September of '96, before they even noticed it had fallen out in the first place.
> [Chen:]  They did discover it because every four

11

months I had to go for checkups.

[IJ:] Yes, but ma'am, see, what you're telling me doesn't make sense. You said that the, the IUD fell out in 1996 and it was replaced in September of '96, and I asked you when you noticed that it fell out and you said April of '97. So they're — listen, please. They're reinserting an IUD before you ever realized it had fallen out to begin with.

[Chen:] After, after the checkup they had discovered that it had fallen out and they reinsert[ed] it.

[IJ:] When was that?

[Chen:] In September of '96.

[IJ:] But that's not what you just told me. You said you noticed it fell out in April of '97.

[Chen:] That was the second IUD that had fallen out. I didn't know when it had fallen out.

In his oral decision, the IJ relied heavily on this exchange in finding Chen's

testimony not credible:

She stated that the first IUD fell out and it was discovered that it had fallen out in 1996. She stated that the second IUD was inserted in September of 1996. Then [Chen] contradicted her testimony and stated that she noted that the IUD had first fallen out in April 1997. The Court attempted to explain to the respondent that this testimony did not make any sense, inasmuch as, if I follow her testimony, they replaced the IUD before they ever noticed that it had fallen out. Then [Chen] changed her testimony and stated that they noticed that the second IUD had fallen out in April of 1997 when she became pregnant, and she further stated that she discovered that the first IUD fell out during a physical checkup in 1996. Again, it appeared to the Court that the respondent was confused about her testimony. It appeared to the Court that, rather than these events actually happening to [Chen] and rather than [Chen] relating what had happened in the past, that the respondent had memorized this testimony and consequently that calls for the confusion when she was getting her facts backwards.

We are unable to discern any place in the transcript where Chen's testimony was

confused or where she "g[ot] her facts backwards." Rather, the confusion appears to rest with the IJ. Chen never testified that the first IUD was discovered missing when she learned she was pregnant in April 1997. Instead, she clearly stated, consistent with the account in her asylum application, that she was forced to insert two IUDs: the first was discovered missing at a medical examination in September 1996, the second one was then inserted, and that second IUD was discovered missing in April 1997 when Chen learned she was pregnant. We are therefore at a loss to explain the IJ's conclusion that Chen's testimony "did not make any sense" and his belief that "they replaced the IUD before they ever noticed that it had fallen out," and conclude that the IJ's adverse credibility determination on this point is not supported by substantial evidence.

## B.  Testimony Regarding Abortion and Threat of Sterilization

The IJ faulted Chen for "chang[ing] her testimony" when she "initially told the Court that she was forced to undergo a sterilization in 1997," but then stated that she "was aborted and that the Chinese authorities wanted to sterilize her, but she escaped." Based on this discrepancy, the IJ concluded that Chen "was clearly confused as to what allegedly happened to her in China," and that this portion of her testimony was fabricated.

Chen's testimony was as follows:

> [Chen's Counsel:] [W]hat have you experienced in China that makes you feel you were persecuted?
> [Chen:] They, they force me to go — to undergo sterilization.
> [IJ:] When, when did you undergo sterilization?
> [Chen:] In 1997.

13

[IJ:]  And what do you mean by sterilization?

[Chen:]  Because I have a daughter and I didn't wait four to five years [to have another child] and, and I was pregnant again.

[IJ:]  Yeah?  So what happened?

[Chen:]  And when they discover my pregnancy they force me to, to undergo an abortion.

[IJ:]  Well there's a difference between abortion and sterilization.

[Chen:]  Yes.

[IJ:]  Did you undergo both?

[Chen:]  Yes, the abortion happened.

[IJ:]  And then were you sterilized after the abortion?

[Chen:]  They notify me for sterilization and I escaped.

[IJ:]  So why did you tell me that you had — that you [were] forced to undergo a sterilization?

[Chen:]  Because, because I didn't wait four to five years and they, they had — they wanted to take me for a sterilization.

[IJ:]  But I still — you told me a few moments ago that you, you underwent a sterilization.

[Chen:]  No, I, I didn't mean to say that.  I meant to say I underwent [an] abortion.

The IJ's adverse credibility finding is not supported by this exchange.  The IJ asked Chen directly, "what do you mean by sterilization?" and Chen answered, "when they discover my pregnancy they force me to, to undergo an abortion."  After informing Chen that there was a distinction between sterilization and abortion, Chen clarified that she "didn't mean to say" sterilization, and her other testimony was fully consistent with the statements in her asylum application that she was forced to undergo an abortion when her second pregnancy was discovered, and then pressured to undergo sterilization, at which point she fled to Fuzhou.  Based on this testimony, we do not believe a reasonable

14

adjudicator could conclude that Chen's testimony was so "clearly confused" that it had to be fabricated.

### C.     Testimony Regarding the Date of the Chen's First Pregnancy

The IJ faulted Chen for "testif[ying] that she first became pregnant in China on September 4, 1994.  This is actually the birth date of her firstborn child, her daughter.  Then she changed the date to 1993.  She was asked as to when in 1993 she first became pregnant, and she stated to the Court that she did not remember the month."  The IJ concluded that it was "extremely difficult to believe that [Chen] would not remember the very first time that she ever became pregnant."

Chen's testimony on this point was as follows:

> [Chen's Counsel:]  When did you get pregnant the first time?
> [Chen:]  1994 on September 4th.
> [IJ:]  That, that's when you actually became pregnant or that's when you noticed you were pregnant?
> [Chen:]  That's the first child.
> [IJ:]  That's the first child what?
> [Chen:]  Yang Ya Ping [Chen's daughter].
> [IJ:]  No, but what, what does, what does that date signify, September 4th, 1994?
> [Chen:]  My daughter's birthday.
> [IJ:]  Yeah, but when did you become pregnant?
> [Chen:]  In '93.
> [IJ:]  When?
> [Chen:]  I don't, I don't remember the month.

Again, we do not perceive a "change" in testimony; rather, it appears that Chen was merely confused as to what date her counsel wanted to know.  Upon clearing up the

15

initial confusion, we do not believe that Chen's inability to recall, at that moment, the date on which her first child was conceived could lead a reasonable adjudicator to conclude that Chen testified falsely. The date on which Chen's daughter was conceived is tangential to her testimony regarding the forced abortion and threat of sterilization. As stated above, for petitioners who applied for asylum prior to May 11, 2005, inconsistencies and discrepancies that do not involve "the heart of the asylum claim" cannot support an adverse credibility finding. Berishaj, 378 F.3d at 323. Chen testified that she believed China's family planning laws required her to wait "four to five years" after having her first child before she could seek permission to have a second child. The date on which her first child was conceived is irrelevant to this calculation and, even if it were not, there is no question that her discovery that she was pregnant in April 1997 was not "four to five years" after the conception or the birth of her daughter in 1994.

The only basis on which Chen's failure to recall the date of conception could conceivably have a negative effect on her credibility is its tendency to suggest that Chen's daughter was born earlier or that she does not have a daughter at all. We believe the fact that Chen could not remember the exact month in 1993 of her daughter's conception is, on its face, insufficient to yield such findings. Common sense tells us that while a person can reasonably be expected to remember the birth date of her first child (which Chen knew), or even the date on which she learned she was pregnant (which Chen knew regarding her second pregnancy), the date of conception may not be known with precision

16

and, given variety in gestation periods, can fall within a range of dates. We are thus wholly unpersuaded that it is "extremely difficult to believe" that Chen would not have been able to answer the question of when her daughter was conceived.[6]

We therefore conclude that this adverse credibility finding is unsupported by substantial evidence.

### D. Testimony Regarding Chen's Life in Fuzhou

The IJ concluded that Chen's testimony that she did not leave Fuzhou from 1997 to 2001 to visit her daughter because she feared being sterilized was not credible because Chen "told the Court that the officials threatened to sterilize her if she again violated the birth control laws," and "there was no testimony that between August of 1997 and March of 2001 [Chen] violated any of those birth control laws, and consequently she would not have had a verifiable fear of being sterilized." We find this conclusion to be bizarre. Chen testified that she fled to Fuzhou in 1997 to avoid detection of her pregnancy, but when she returned to her village for a brief visit with her daughter she was seized by officials and forced to undergo an abortion. She further testified that those officials threatened to have her sterilized, and she fled to Fuzhou again to avoid that fate.

We find nothing implausible in Chen's testimony that, regardless whether she committed any verifiable violations of the birth control laws during her time in Fuzhou,

---

[6] Indeed, if Chen had wanted to deceive the IJ, she could simply have counted back nine months from the date of her daughter's birth and given the IJ a date in December 2003.

17

her experiences gave her a well-founded fear of forced sterilization if she returned to her village. Having returned to her village once, only to have allegedly suffered a forced abortion, and having been threatened with forced sterilization, we do not believe a reasonable adjudicator could conclude that Chen should have felt free to return home at any time and trust that the family planning officials would not make good on their threat. As for the notion that Chen had nothing to fear because she had done nothing wrong, this is belied by the fact that the officials allegedly threatened to sterilize her after her second child had already been aborted.

### IV. Conclusion

We conclude that the adverse credibility findings addressed above are not supported by substantial evidence. We acknowledge, of course, that Yang's failure to mention Chen's involuntary abortion or the threats of forced sterilization in his asylum application weighs against the petitioners' credibility. Without relying upon the adverse credibility determinations rejected above, however, we cannot say that a reasonable adjudicator would nonetheless find Chen and Yang not credible. Rather, such a determination should be made by the immigration court in the first instance. See INS v. Ventura, 537 U.S. 12, 16-17 (2002).

We therefore grant the petition for review, vacate the BIA's decision to the extent it affirmed the IJ's decision, and remand to the BIA with instructions to vacate the IJ's oral decision and remand for further proceedings consistent with this opinion. On

18

remand, the IJ must carefully reexamine the record and determine whether, in light of our decision reversing the adverse credibility findings related to Chen's testimony, the evidence supports Chen's eligibility for relief.[7]

---

[7] In light of our conclusions above, we also suggest that consideration be given on remand to reassigning this case to a different IJ.