

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-12-2006

# Filja v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-1782

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Filja v. Atty Gen USA" (2006). *2006 Decisions*. Paper 1002.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1002

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-1782
_____

IGLI FILJA, LULJETA FILJA, ENDRIT FILJA
Petitioners

v.

ALBERTO R. GONZALES, Attorney General
of the United States*
Respondent.

*(Substituted pursuant to Fed. R. App. P. Rule 43(c))
_____

On Petition for Review of an Order of
The Board of Immigration Appeals

(BIA Nos. A73 540 510; A73-540 509; A73 540 508)
_____

Submitted Under Third Circuit LAR 34.1(a)
January 9, 2006
_____

Before: BARRY and AMBRO, Circuit Judges, and
DEBEVOISE*, Senior District Court Judge

(Filed: May 12, 2006)

_____

* Honorable Dickinson R. Debevoise, Senior District
Court Judge for the District of New Jersey, sitting by
designation.

OPINION OF THE COURT

---

Barbara J. Brandes
Law Offices of Barbara Brandes & Associates
225 Broadway, Suite 900
New York, New York 10007

ATTORNEY FOR PETITIONERS

Thomas A. Marino
United States Attorney, Middle District of Pennsylvania
Stephen R. Cerutti, II
Assistant United States Attorney, Middle District of
Pennsylvania
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108-1754

William C. Peachey, Esquire
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

ATTORNEYS FOR RESPONDENT

**Debevoise, Senior District Judge**

Petitioners, Igli Filja, his wife, Luljeta Filja, and his son, Endrit Filja,[1] petition for review of a February 23, 2004, decision of the Board of Immigration Appeals (the "BIA" or "Board")

---

[1] In this opinion Igli Filja will be referred to as "Filja." When reference is made to his wife or son, they will be identified as such. In the transcript of the March 20, 1996 hearing before the IJ the son is referred to as Andrea.

denying petitioners' motion to reopen a previous decision of the Board affirming an Immigration Judge's ("IJ") decision denying petitioners' requests for asylum and withholding of deportation. We hold that the BIA misinterpreted the time limitation found in 8 C.F.R. § 1003.2(c)(3)(ii) for motions to reopen due to changed country conditions and that its denial of the motion on other grounds was an abuse of discretion. We will grant the petition and remand the matter to the BIA for further proceedings.

## I. <u>Background</u>

Filja was lawfully admitted to the United States on September 6, 1992. His wife and son were lawfully admitted on November 29, 1993. In 1994, they filed a request for asylum in the United States based on prior persecution and a well-founded fear of future persecution if forced to return to their native country, Albania.

A. <u>The IJ Hearing</u>: On June 28, 1996, the IJ held a hearing on petitioners' applications for asylum and withholding of deportation. Filja was the only witness, and what follows is a summary of his testimony.

After he completed high school in 1982, Filja, because of his and his family's suspected opposition to the governing Communist Party, was not permitted to obtain higher education. In 1985, through the intervention of a relative of his father, he obtained a job as a printer. The relative was a supporter of the Communist Party. Feeling sorry for Filja (even though Filja was a supporter of democratic principles) the relative used his influence to obtain a position for him at the Party newspaper called Zeri i Popullit - Voice of the People. Filja was relegated to the disfavored night shift and worked six nights a week.

There came a time in 1989 when Filja met with 20 to 25 workers to discuss their low wages, housing, the politics of the government and lies that the government was printing in the newspaper. The next day he and several others who had spoken that night were taken to the secret police. The police informed them "we hope these things will never repeat." On September 5, 1990, Filja again spoke to a group of workers and was again

3

called in for questioning. He was handcuffed for three and one-half hours and was told he was causing a revolution inside the company, which could cause him a lifetime in jail.

Despite the threat, Filja promised to speak to the people again on January 10, 1991, a promise he carried out. Instead of calling him into the police station, the authorities, who held positions in both the printing company and the government, took another tack. On June 21, 1991, they sent him and the three others who spoke at the meetings to Canada, purportedly to receive training upon a high speed, three-color printing machine which the newspaper was purchasing for $200,000 from a Canadian company called New Concepts. When the four men arrived in Canada they found no new machine, and Filja was put to work for ten hours a day as a cleaner and folding newspapers.

In mid-August, 1991, the four were instructed to return to Albania. At that time Filja believed that the Canadian assignment was a ploy to provide cover for the newspaper officers in Albania who, Filja speculated, had absconded with the $200,000 appropriated for the purchase of the press. He also believed that upon the return of the four men to Albania they would be arrested and charged with the theft. The four men refused to return to Albania.

Filja described a political change that took place after his refusal to return from Canada. He and his companions had left for Canada on June 21, 1991. At that time the Socialist Party (which in 1990 became successor to the Communist Party) was in power and owned and controlled the paper. In his original asylum application Filja based his asylum request upon his opposition to the Socialist Party. The Democratic Party, which he supported, was out of power, and its members were under continuing attack by the Socialist Party.

In late 1991, however, several months after Filja refused to return from Canada, the Democratic Party took control of the government, but the police and secret police still contained supporters of the Socialist Party. Although the Democratic Party destroyed the company that owned Zeri i Popullit, it sold the paper to the same people who owned it before - the Socialists.

4

Filja applied for asylum in Canada, which was denied in 1992.  Three months after the denial he obtained a visa and entered the United States on September 6, 1992.

About a month before the IJ hearing there occurred a series of events that caused Filja further concern.  His father, who continued to live in Albania, was served with what purported to be a warrant for Filja's arrest on charges of having caused serious damage to the state in the amount of $200,000 by not returning to his duties.  The father sent a copy of the warrant to Filja, who received it two weeks before the hearing.  This inspired new fears in Filja's mind, namely, that he was being pursued not only by the Socialists but also by the Democratic Party, which, because he had worked for the Socialist Zeri i Popullit, had concluded that he was a Socialist.  At the hearing Filja's attorney filed a supplemental statement to reflect this fear, and the IJ admitted a photocopy of the warrant and a translation into evidence.

The IJ's January 16, 1997 opinion set forth the events substantially as Filja testified about them.  The IJ stated with respect to the arrest warrant:

> This document was submitted by the Service to the embassy in Tirana.  In a FAX communication signed by the Honorable Consul Susan Lively, the Document in question turns out to be fraudulent.

Thereupon the IJ concluded that:

> Respondent's story never happened at all.  I feel that after seeing his date of arrival and his wife and son's, the date when the travel documents were issued, that the respondents planned very carefully their departure from Albania.  Respondent's reasons for coming to the USA in my opinion are not related to his political activities, which I find never happened at all, but to personal reasons probably dealing with their wishes to reside and work in the USA.

5

. . . Respondent's testimony lacks in credibility and it is rejected as incoherent and implausible, short of calling it a total fabrication in an attempt to convince the court to grant this application for asylum.

In accordance with his opinion, the IJ ordered that the applications for asylum and withholding of deportation be denied. On March 7, 1997, the Filjas appealed to the BIA.

In June 1997, the Socialist Party returned to power in Albania. This occurred after the IJ's January 1997 opinion and well before the decision of the BIA on the Filjas' appeal.

B. The BIA Appeal: In a March 19, 2002 opinion the BIA rejected the IJ's credibility determination. It held that the fact that the arrest warrant may have been fraudulent did not provide a basis for a finding that Filja's testimony was incredible, because the consul's FAX was submitted after the close of the hearing; it had not been admitted into evidence; and there was no indication that the IJ provided Filja with an opportunity to rebut it.[2] Further, the BIA found the IJ's comments about Filja's motivation for coming to the United States were speculative in nature and did not support a finding of incredibility. Consequently, it did not affirm the IJ's adverse credibility finding.

Nevertheless, the BIA concluded that Filja's experiences in Albania did not rise to the level of persecution. Addressing Filja's assertion that he was being framed by his former employer by a charge of theft of $200,000, the BIA found that:

_____

[2] It later developed that the arrest warrant was not genuine, and that representatives of the newspaper had delivered it to Filja's father, apparently in an attempt to induce Filja to return to Albania. When it developed that the arrest warrant was bogus, Filja no longer had reason to believe that both the Democratic Party and the Socialist Party were hostile to him. In fact, as will be described subsequently, officials of the Democratic Party later provided assistance to Filja and his wife and son.

even assuming the validity of [the arrest warrant] which the respondent himself placed into evidence, on its face the document does not squarely corroborate his claim of being accused of misappropriating or stealing $200,000 in company funds. To the extent the respondent may be subject to punishment for not returning to work at his former place of employment, resulting in financial loss to the company, it has not been persuasively established that any such action taken against him would be imposed on account of a ground protected by the Immigration and Nationality Act.

The BIA determined that the Filjas had failed to establish past persecution or a well-founded fear or clear probability of persecution in Albania based on race, religion, nationality, membership in a particular social group, or political opinion, actual or imputed. It dismissed the appeal.

C. <u>Motion to Reopen</u>: On October 9, 2003, the Filjas moved before the BIA to reopen the proceedings on the grounds that there had been changed conditions in Albania, and that Filja was deprived of his due process rights as a consequence of his former counsel's ineffective assistance. He also sought protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT"). In support of the motion Filja submitted a greater than 300 page record consisting of Filja's and his wife's affidavits; documents evidencing past persecution of Filja's family by the Communists-Socialists; affidavits of persons having personal knowledge of the family's past persecution, Filja's activities on behalf of the Democratic Party, and Filja's assignment to the Canadian printing press project; and eight reports of the State Department, Human Rights Watch, and Amnesty International describing continuing persecution by the Albanian police and secret police of those supporting the principles of the Democratic Party. The record contains evidence supporting Filja's contention that because of the ineffectiveness of his attorney his case was not fully presented at his June 28, 1996 hearing before the IJ.

The changed condition upon which Filja based his motion

7

was the June 1997 return to power of the Socialist Party. Filja relied on the record he submitted to support the significance of that event and the effect it would have upon him and his family.

In his own affidavit Filja describes the treatment his family suffered at the hands of the Communist regime after it came to power when Albania was liberated in 1944. Previously they had been prosperous. His maternal grandfather had been a First Captain of the King Zog regime. The Communists seized their property, executed a number of the family members, interned some and deported others from their homes to work camps. Two relatives escaped to the United States and have been granted asylum. In his affidavit, Filja describes his family's and his own participation in the Democratic Party, formed to oppose the Communist Party's successor, the Socialist Party. He participated in toppling the statue of dictator Enver Hoxha on June 10, 1991, and ten days later left the country for Canada on the mission to purchase the printing press for the Socialist Party paper, Zeri i Popullit. He informed a leader of the Democratic Party of the project before leaving for Canada, and once in Canada decided to remain. Prior to his IJ hearing he learned of the arrest warrant that had been delivered to his father, and, believing it to be genuine, submitted it as evidence. He later learned that it was false and was prepared by his ex-boss at the paper to get him back to Albania.

The exhibits include authenticated official certificates of the execution and imprisonment of Filja's relatives for opposing the Communist regime.

Filja's wife's affidavit recited that after Filja had been in Canada for three months, he telephoned her that he was not going to return. Having no means of support, she went to live with her family. People from Zeri i Popullit came to her father and Filja's father to seek information about Filja, and threatened her, stating, "if you're not going to talk to Igli [Filja] about the situation you and your son are going to pay the price and Igli is not going to see his son again." She stated that unknown people attacked her, her son and her brother. She attributed the attack to those who threatened her on account of Filja's continued absence. "We were coming out from my father's house. My

8

brother was the first one to get out.  He was hit by a motorcycle. My son and I were fine."

The brother remained in a coma in a hospital for three months, but survived. Fearing for her and her child's lives, Luljeta Filja went to a friend in the Democratic Party, Niazi Kosovrasti, and sought his help obtaining a visa.  He was successful, and she was able to travel to the United States in 1993.  Kosovrasti, Ex-Secretary of Local Power in the Democratic Party from 1995 till 1997, submitted a declaration dated November 12, 2002.  It reads:

> Filja Igli, descend from an intellectual family with democratic progressive convictions.  With the coming at the power of communism in 1944, his family was persecuted from the dictatorial regiment; confiscated his properties and than imprisoning, shootings, deportations his closed members of the family.  So, in 1947 is shouted with the deputies group, Karbunara Hysen son of Sheh and his father, going on with the deportation of Shehu Drita who was like a parent for File Suzana, Igli's mother.

> In this atmosphere is growing up and educated Filja Igli, who in younger age felt by himself the pressure of communism dictatorship which not only have prisoned and persecute his relatives, but even himself denied from many social rights.  He was not allowed to continue university studies, but was offered to him a difficult job, only night's shift.

> I have been introduced personally to File Igli later during the years 1990-1991 as a noted activist of the democratic movement in Albania.  He have worked for the dissemination of democratic ideas in the youth rank of the neighborhood where he lived.  Also, he took part in all the demonstrations that Democratic Party organized during the years 1990-1991.

> In July 1991 Igli went to Canada with a mechanics group who will remove machinery's of a printing office which social government had brought for the production of the

communist newspaper "Zeri i Popullit". Igli didn't make this service to the communist. Igli left Canada and went to America. From July 1991 to March 31, 1992, when Democratic Party won the general parliamentary elections, his wife and family have been threaten from the communists. His wife, Filja Luljeta in the end of year 1991, came to me, in the residency of Democratic Party worried from the pressure made to her, cause her husband, Igli, left to America looking for protection from Democratic Party. After take over the power violently, on 1991, the communist continue to be in power.

I think that the story of Igli's leaving on 1991 is not forget till now, so his coming in Albania can be problematic.

Drita Shehu, one of Filja's relatives who had been granted asylum in the United States, submitted an affidavit that stated:

I was granted political asylum base on Persecution, Mistreatment and Torture. My husband Hysen Shehu Karbunara and his father were executed on death penalty with the known "Group of the Deputies" in the year 1947 from Communist Regime. The persecution and torture followed my family and me; we were deported from our homes to a remote village where we wore forced to work in labor camps.

Part of my family it is Suzana (Igli's mother) and her sister, my sisters daughters, whom I took care for a long time because their mother died to young, 28 years old.

I have known Igli myself. He had a hard time growing and did not have all the privileges like every citizen had, because of his family background. Because of that he grew up hating the regime on power, and in 1990 he was on front of every democratic activity. He helped and worked against the Social Communist regime in existence.

Considering his and his family's background, his hate and activities he did against the Social Communist regime, I

10

think that him and his family will be in danger and it will pay for Igli's actions if he returns in that Social Communist regime.

Another relative, Mimoza Korca, who was born in Albania in 1944, submitted a sworn statement concerning the persecution to which the family had been subjected. It reads in part:

My name is Mimoza Korca. I am an American citizen issuing the following statement on behalf of Igli Filja, who is the son of my first cousin, Suzana Filja.

In November of the year 1944 the communists took the power in our country and started building the harsh dictatorship regime that ruled for almost half of century. My family, as a wealthy one, was among the most persecuted ones in Albania. The communists sentenced to death and executed my father, my uncle as well as two of my first cousins. My father was incriminated as a collaborator of the anglo-americans and executed. My uncle, (my father's brother), was accused as if he was member of a group that had thrown a bomb against the Russian Embassy in Tirana, prosecuted and killed under this untrue accuse. Same destiny had also the two my first cousins, one of them 23 years old and the other in his 17th year of life.

Without a difference is as well as the political background of my husband's family, who has four victims dead as a result of the communist regime: his father past away under hunger strike in prison as an act of rebellion against he regime and three of his uncles were executed by the communists. According to all of those facts, my point of view is that if my cousin Igli Filja goes back with his family in Albania, the so named socialists, (in fact former communists), that are ruling the country will, without delay inflict harm to him and his family. So with him, it will recommence again from the beginning, the sad history that had started 55 years ago with our families.

11

A Filja friend, Filip Kristani, signed an affidavit providing details concerning the Canadian venture. It reads:

> In 1990, I started to work in Zeri Popullit one of the biggest newspaper on that time. For Albania, it was also one of the best propaganda for the regime. I was working as a mechanical engineer, Igli and I, were working together on finishing of the newspaper for that company and we made sure all the machines were working non stop and we did work, night shift. Igli Filja has been a friend of mine for more than 15 years I spend with him many evenings talking about the regime, he always use to tell me about his family how the communist regime torched his family and he used to make plans, Igli knew many people who then became very important on Democratic Party. In 1991 the company where we worked had a project to obtain a new printing machine from Canadian Communist party, I think that was a rushed time for the socialist party because of the election, so we had to go in Canada to specialize on the best color printing machine. Igli was the first one who said we should not return for this project and that's what we did we never went back to Albania. I believe if Igli Filja goes back in Albania he will be arrested because of his political beliefs.

The eight Department of State Country Reports, Human Rights World Reports and Amnesty International Reports that Filja submitted in support of his motion to reopen provide evidence that Albanian police and other authorities were continuing persecution of those who opposed the Socialist regime. For example:

> The Government's human rights record remained poor in many areas; although there were some improvements in a few areas, serious problems remain. Police beat and otherwise abused suspects, detainees, and prisoners. Prison conditions remained poor. The police arbitrarily arrested and detained persons and prolonged pretrial detention was a problem. The judiciary was inefficient, subject to corruption and executive pressure on the

12

judiciary remained a serious problem.

U.S. Department of State, Albania, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES - 2002.

Following a series of political crises, by mid-year Albania entered a period of which appeared to be more stable and inclusive governance. Nevertheless, impunity for police abuse, failures of various government branches to uphold the rule of law, trafficking in human beings, and widespread violations of children's rights continued to be major concerns.

. . . The excessive reaction against Albania's highest court revealed a thin commitment to the rules of law when political stakes are high.

. . . Albania's executive and judicial authorities continued to fail to combat police violence. Torture and physical abuse of detainees were widespread and unpunished.

HUMAN RIGHTS WATCH WORLD REPORT 2003, ALBANIA, *available at* http://www.hrw.org/wr2k3/europe1.html.

Several cases of torture and other serious abuse by the Albanian police in 2001 highlighted the prevalence of police misconduct, particularly as it concerned children and opposition activists . . . . The DP [Democratic Party] repeatedly protested the arrests and alleged police beatings of participants in its political rallies, which sometimes turned violent. Azgan Haklaj, the head of the DP branch in Tropoja, was brutally assaulted by the special police in January 2001 after having been arrested for his alleged role in a November 2000 attack on the Tropoja police station.

HUMAN RIGHTS WATCH WORLD REPORT 2002, ALBANIA, *available at* http://www.hrw.org/wr2k2/europe1.html.

Detainees, including children, continued to be frequently ill-treated and sometimes tortured during arrest and in

police custody, usually to force confessions. Judicial proceedings against police officers accused of ill-treatment were rare.

AMNESTY INTERNATIONAL, ALBANIA COVERING EVENTS FROM JANUARY - DECEMBER 2002.

Although the record contains evidence that even during the years of Democratic Party rule, Socialist Party supporters within the police and special police continued to attack Democratic Party activists, the situation became dramatically more dangerous for those activists when the Socialist Party reestablished control of the entire governmental structure in 1997. This, of course, is the changed country condition upon which Filja bases his motion to reopen.

The supporting papers seek to show why Filja's initial application for asylum at the June 28, 1996 hearing failed fully to develop the important background information concerning the longstanding persecution of Filja's family, Filja's own participation in the Democratic Party activities, and the continuing threats made against Filja's wife and son. The reason given is the ineffective representation provided to Filja by his then counsel.

In his many papers Filja presented a host of errors committed by former counsel: i) he failed to advance the facts Filja recounted to him concerning his family's long-standing persecution and his political activity on behalf of the Democratic Party, neither correcting and supplementing Filja's form asylum affidavit nor preparing to bring out full testimony at the hearing; ii) he informed Filja that he did not have a case because the Democratic Party was then in power, failing to comprehend that even though the Democratic Party was in power the Socialists had strong support within the police forces and were killing opposition persons to get back in power; iii) he failed to recognize that Filja feared persecution by the Socialist Party and police whom the Democratic Party had been, and would be, unable to control; iv) he failed to set forth the specific mistreatment Filja's close relatives – wife, son, father, grandfather and maternal great-aunt – had received as a result of

14

being associated with the Democratic Party; v) he failed to develop the fact that his brother-in-law, Gene Dingu, was attacked outside the home where Luljeta Filja and the son were living; vi) he failed to call available witnesses, including Filja's wife, who was sitting outside the hearing room, who could have provided detail and corroboration to Filja's account; and vii) he failed to provide State Department Country Reports and reports of human rights organizations that describe the political situation in Albania and ongoing persecution of political dissidents such as Filja.

D. <u>The BIA's Denial of the Motion</u>: On February 23, 2004, the BIA disposed of Filja's motion to reopen and the record offered in its support. It noted that the motion was received on October 9, 2003 and held it was untimely because it was not filed within 90 days of the BIA's March 19, 2002 opinion, the final administrative order in his case, citing 8 C.F.R. §1003.2(c). The BIA rejected Filja's argument that he came within the exception to the 90-day rule because there had been changes in conditions in Albania, stating, "we note that the asserted changes, including the election of Socialist Party members to the government, occurred prior to our decision in March 2002, and as such, this evidence even if deemed material was available and could have been discovered or presented at that time. <u>See</u> 8 C.F.R. § 1003.2(c)(3)(ii)."

The BIA rejected Filja's argument that the time limitation for the filing of the motion should be tolled because he was deprived of due process as a consequence of ineffective assistance of his former counsel. The BIA stated that "while the respondent appears to have complied with requirements set forth in <u>Matter of Lozada,</u> 19 I. & N. Dec. 637 (BIA 1988) he has failed to demonstrate that his former counsel's performance was so inadequate that it prejudiced the outcome of proceedings."[3]

---

[3] In <u>Matter of Lozada</u>, 19 I. & N. Dec. 637, 1988 WL 235454 (BIA 1988), <u>aff'd</u>, 857 F.2d 10 (1st Cir. 1988), the BIA laid out a three-step procedure for establishing "egregious" ineffective assistance that would justify reopening: i) the petitioner must submit an affidavit setting forth the agreement

15

The BIA set forth the legal principles governing relief under the CAT and held that Filja failed to demonstrate prima facie eligibility for its protection because "[t]he evidence of record fails to indicate that it is more likely than not that respondent will face torture upon his return to Albania," and, further, "his arguments, in substantial part, consist of the same arguments previously presented in support of his applications for asylum and withholding of deportation which were denied both by the Immigration Judge and by the Board."

On March 22, 2004, Filja filed with the BIA a motion to reconsider and/or request for en banc review. The BIA denied the motion to reconsider. The Filjas now petition for review of the BIA's February 23, 2004 order denying Filja's motion to reopen.

---

with prior counsel with respect to the actions to be taken and what counsel did or did not represent to the petitioner in this regard; ii) before allegations of ineffective assistance of counsel are presented to the BIA, former counsel must be informed of the allegations and given an opportunity to respond; iii) if it is asserted that prior counsel's handling of the case involved a violation of ethical or legal responsibilities, petitioner's motion should reflect whether a complaint has been filed with appropriate disciplinary authorities, and, if not, why not. We, like most Courts of Appeal, have given general approval to the Lozada approach to claims of ineffective assistance of counsel. See, Lu v. Ashcroft, 259 F.3d 127 (3d Cir. 2001).

## II.  Jurisdiction and Standard of Review

We have jurisdiction of the Filjas' petition under 8 U.S.C. § 1252, which grants federal courts of appeals jurisdiction to review final orders of the BIA.  We must uphold the BIA's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 480 (1992).  We review the BIA's conclusions of law de novo.

We review the BIA's denial of a motion to reopen for abuse of discretion, Lu v. Ashcroft, 259 F.3d 127, 131 (3d Cir. 2001), and review its underlying factual findings related to the motion for substantial evidence.  Sevoian v. Ashcroft, 290 F.3d 166, 170 (3d Cir. 2002).  The BIA's denial of a motion to reopen may only be reversed if it is "arbitrary, irrational, or contrary to law."  Id. at 174 (internal quotation marks omitted).

## III.  Discussion

A.  Timeliness of Petition to Reopen: The IJ held the Filjas' asylum hearing on June 28, 1996, denying asylum and withholding of deportation on January 16, 1997.  In June 1997, the Socialist Party returned to power in Albania.  On March 19, 2002, the BIA dismissed the Filjas' appeal.  On October 9, 2003, the Filjas moved under 8 C.F.R. § 1003.2(c)(3)(ii) to reopen and to remand to the IJ to reapply for asylum and withholding of deportation due to changed country conditions and to apply for relief under the CAT.  The BIA held that the motion to reopen was untimely, interpreting § 1003.2(c) as requiring that, although the country conditions in Albania had changed subsequent to the date of the IJ's 1997 decision, the motion should have been made prior to the BIA's March 19, 2002 decision.

Under the applicable regulation, a motion to reopen removal proceedings "must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened."  8 C.F.R. § 1003.2(c)(2).  Excepted from this time limitation set forth in paragraph (c)(2) are motions "to reopen proceedings: . . . (ii) [t]o

17

apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality . . ., if such evidence is material and was not available and could not have been discovered or presented at <u>the previous hearing</u>." 8 C.F.R. § 1003.2(c)(3)(ii) (emphasis added). This regulation implements 8 U.S.C. § 1229a(c )(7)C)(ii), which excepts the time limitation "if such evidence is material and was not available and would not have been discovered or presented at the <u>previous proceeding</u>" (emphasis added).

Interpreting the regulation, the BIA held that the Filjas' motion to reopen was untimely because the changed country conditions were known at the time of the "previous hearing" before the BIA, namely, its March 19, 2002 decision. The BIA's construction of the statute is entitled to deference and must be accepted by the Court if it is based upon a permissible construction of the statute. <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43 (1984); <u>see</u> <u>INS v. Aguirre-Aguirre</u>, 526 U.S. 415, 424-25 (1990); <u>Abdulai v. Ashcroft</u>, 239 F.3d 542, 551 (3d Cir. 2001).

The language of the statute is ambiguous, stating that the changed country conditions must not have been presentable at the "previous proceeding." It does not specify whether the "previous proceeding" is the application heard by the IJ or the appeal heard by the BIA. The government relies upon <u>Chevron</u> to support its contention that the Court must accept the BIA's contention that the statutory language, "previous proceeding," and the regulatory language, "previous hearing," encompass the appellate proceeding before the BIA, arguing in its brief that "[s]ince any application to re-open a case once it has been taken to the BIA must be made to the BIA, it is certainly permissible to interpret 'previous proceeding' in the context of a motion to re-open a BIA case to refer to the previous appeal to the BIA."

Two considerations lead to the conclusion that the government's argument and the BIA's holding are flawed. First, the structure that the statute and regulations create for original hearings and appellate review of asylum and withholding of removal applications permits evidentiary material to be presented only at IJ hearings and not on BIA review. Second,

18

when 8 C.F.R. § 1003.2(c)(3)(ii) is construed in conjunction with other § 1003 regulations, the words "previous hearing" can only refer to the proceedings before the IJ, and not to the proceedings before the BIA.

We examine first the statutory and regulatory structure established for IJ hearing and BIA review on appeal of motions for asylum and withholding of removal. It is the IJ who has the statutory authority to "conduct proceedings for deciding the inadmissability or deportability of an alien," 8 U.S.C. § 1229a(a)(1), during the course of which he "shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1).

Appellate review of IJ decisions is conferred upon the BIA. 8 C.F.R. § 1003.1(b). Under the regulations "[t]he Board will not engage in de novo review of findings of fact determined by an immigration judge," 8 C.F.R. § 1003.1(d)(3)(i), and "the Board will not engage in factfinding in the course of deciding appeals. A party asserting that the Board cannot properly resolve an appeal without further factfinding must file a motion for remand. If further factfinding is needed in a particular case, the Board may remand the proceeding to the immigration judge. . . ." 8 C.F.R. § 1003.1(d)(3)(iv).

The Filjas could not have presented evidence of changed country conditions to the BIA on their appeal on the merits of the IJ's decision. The BIA faults the Filjas for not filing their motion within an artificial time period that was measured by the BIA's issuance of its decision in a proceeding that had nothing to do with, and, in fact, precluded, new evidence. This suggests that the BIA's interpretation of § 1003.2(c)(3)(ii) was unreasonable.

If one traces the labyrinthine path of the applicable regulations, one can only conclude that "previous hearing," as used in § 1003.2(c)(3)(ii), refers to the hearing before the IJ, which is totally consistent with the statutory and regulatory factfinding procedures.

The statute authorizes motions to reopen removal

19

proceedings, 8 U.S.C. § 1229a(c)(7), and provides that "[t]he motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material." 8 U.S.C. § 1229a(c)(7)(B). A successful motion to reopen results in a hearing, and an IJ must conduct that hearing.

The usual deadline for filing a motion to reopen is 90 days after entry of a final order of removal, 8 U.S.C. § 1229a(c)(7)(C)(i), except that "[t]here is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 1158 [asylum] or 1231(b)(3) [withholding deportation] of this title and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii). Because the only proceeding at which new evidentiary material could be presented is a hearing before the IJ, the reference to "previous proceeding" in this statutory provision must have been to the hearing before the IJ.

There is a significant difference in the regulatory provisions that govern motions to reopen proceedings before an IJ[4] and the regulatory provisions that govern motions to reopen

_____

[4] 8 C.F.R. § 1003.23(b), dealing with motions to reopen before the Immigration Judge, provides in relevant part:

> (1) . . . A motion to reopen must be filed within 90 days of entry of a final administrative order of removal, deportation, or exclusion, or on or before September 30, 1996, whichever is later . . . . .

> (3) Motion to reopen. A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material.

20

proceedings before the BIA.[5]  Each set of regulations establishes

(4) Exceptions to filing deadlines - (i) Asylum and withholding of removal.  The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for asylum under Section 208 of the Act or withholding of removal under section 241(b)(3) of the Act or withholding of removal under the Convention Against Torture, and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. (emphasis added).

[5]  8 C.F.R. § 1003.2(c), dealing with motions to reopen before the BIA, provides in relevant part:

(2) . . . Except as provided in paragraph (c)(3) of this section, an alien may file only one motion to reopen removal proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened.

(3) . . . The time and numerical limitations set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen proceedings:
. . . .

(ii) To apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing[.]

a 90-day time limit to file such motions; each contains the changed country conditions exception. The significant difference is that in the case of motions to reopen before the IJ the exception applies if the new evidence was not available "at the previous <u>proceeding</u>." The "previous proceeding" can only have been the hearing before the IJ. In the case of motions to reopen before the BIA the exception applies if the new evidence was not available "at the previous <u>hearing</u>." The words "at the previous hearing" were substituted for the statutory and IJ regulatory language - "at the previous proceeding." There is no "hearing" in the usual sense of the word in proceedings before the BIA, and the substitution of the word "hearing" for "proceeding" recognizes that the only place the alien could have presented evidence of changed country conditions was before the IJ.

Thus it was unreasonable for the BIA, referring to the Filjas' motion, to hold that the "changes . . . occurred prior to our decision in March 2002, and as such, this evidence even if deemed material was available and could have been discovered or presented at that time." The BIA's interpretation of "previous hearing" to refer to the proceeding before it rather than to the proceeding before the IJ does violence to the language of 8 C.F.R. § 1003.2(c)(3)(ii) when it is construed in conjunction with the language of related statutory and regulatory provisions, and it is inconsistent with the regulatory structure for fact finding and appellate review established in 8 C.F.R. § 1003.0, <u>et</u> <u>seq.</u> The BIA committed an error of law when it held that the Filjas' motion to reopen and remand was time-barred.[6] We must

---

(emphasis added).

[6] In an unpublished opinion, <u>Siddiqui v. INS</u>, 33 Fed. Appx. 217, 219 (7th Cir. 2002), the Court of Appeals for the Seventh Circuit held that the BIA did not abuse its discretion in using the date of its own decision as the date of Siddiqui's "previous hearing" under 8 C.F.R. § 3.2(c)(3)(ii). The opinion contained no analysis of the statutory and regulatory language, nor did it discuss whether "previous hearing" or "previous

22

determine whether its alternative reasons to deny the Filjas'
motion can be sustained.

As we noted in Sevoian v. Ashcroft, 290 F.3d 166, 169-
74 (3d Cir. 2002), the Supreme Court has identified three
principal grounds on which the IJ or BIA may deny a motion to
reopen immigration proceedings: i) it may hold that the movant
has failed to establish a prima facie case for the relief sought; ii)
it may hold that the movant has failed to introduce previously
unavailable material evidence that justified reopening; or iii) in
cases in which the ultimate grant of relief being sought is
discretionary (asylum, suspension of deportation, and adjustment
of status, but not withholding of deportation) the BIA can pass
by the first two bases for denial and determine that even if they
were met, the movant would not be entitled to the discretionary
grant of relief. INS v. Doherty, 502 U.S. 314, 323 (1992); INS
v. Abudu, 485 U.S. 94, 105 (1988)[7].

_____

proceeding" referred to the IJ or BIA proceeding or to both of
them.

[7] We do not suggest that in an appropriate case the BIA,
in its discretion, could not deny a motion to reopen that is
exempted from the 90-day time limitation by virtue of 8 C.F.R. §
1003.2(c)(3)(ii) on the equitable ground that the moving party
had unreasonably delayed filing the motion. In the present case,
while their appeal was pending, the Filjas theoretically could
have filed a motion to reopen and return their case to the IJ.
That was not, however, a practical course of action for them.
Unbeknownst to them at the time, the attorney representing them
was providing totally ineffective assistance. Further, when the
Filjas obtained effective counsel it was necessary to expend
substantial time and effort to secure evidence required to support
the motion based on the changed country conditions. Witnesses
had to be tracked down in different parts of the United States and
in Albania, and affidavits had to be obtained from them. There
had to be obtained from Albania certified death certificates,
certificates of executions, and certificates of prison sentences, all
constituting evidence of the persecution to which the Socialists
had subjected the Filja family. These circumstances precluded a

23

The Filjas advanced three grounds for their motion to reopen. The first, and most critical ground, was that changes in country conditions in Albania support Filja's fear of facing persecution in his home country. The second was ineffective assistance of counsel. The third was Filja's claim that due to a change in the law he was entitled to relief under the CAT not previously available to him.

B. Changed Country Conditions: The BIA rejected the first ground because, it held, the motion was untimely. As a result of this legal error it made no inquiry whether Filja had established a prima facie case for the relief sought. In light of its timeliness ruling it had no need to examine the voluminous record that Filja filed in support of his motion.

The contents of the record that the BIA failed to consider and apply to the changed country conditions claim are described in some detail above. It included Filja's and his wife's affidavits and evidence of past persecution of Filja's family by the Communists or their successors, the Socialists. It included affidavits of persons having personal knowledge of the family's past persecution and Filja's activities on behalf of the Democratic Party. The record also included eight reports of the State Department, Human Rights Watch, and Amnesty International. It included significant evidence of the ineffectiveness of prior counsel. The likelihood of future persecution claim rested not only upon Filja's and his family's political orientation and activities, but also rested upon a long history of attacks upon the entire family because of its close association with the rulers of Albania before the Communists took over.

Although at the time of the IJ hearing the Democratic Party was in power, adherents of the Socialist Party still held powerful positions in the police and secret police departments and were in a position to threaten their opponents. When in 1997 the Socialist Party returned to power the position of those

motion to reopen upon the occurrence of the changed political conditions in Albania.

24

supporting the Democratic Party became more precarious. This Court is not totally unfamiliar with conditions in Albania. See Caushi v. Att'y Gen., 436 F.3d 220 (3d Cir. 2006).

C. Ineffective Assistance of Counsel: The claim of ineffective assistance of counsel was supported by the same voluminous record that was submitted in connection with the changes in country conditions claim. The BIA conceded that Filja appeared to have complied with the procedural requirements for bringing such a claim set forth in Matter of Lozada, 19 I. & N. Dec. 637 (BIA 1988); aff'd, 857 F.2d 10 (1st Cir. 1988). The BIA opinion contained the formulaic statement that "we have carefully reviewed the record." Then, in the one paragraph devoted to this issue, the BIA's only substantive finding was that Filja "has failed to demonstrate that his former counsel's performance was so inadequate that it prejudiced the outcome of the proceedings."

The BIA is not required to "write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." Mansour v. I.N.S., 230 F.3d 902, 908 (7th Cir. 2000) (internal quotations omitted). The BIA must at least show that it has reviewed the record and grasped the movant's claims. See Sevoian, 290 F.3d at 178. Here, although the BIA stated that it "carefully reviewed the record," there is nothing in its one paragraph devoted to the ineffective assistance of counsel claim that is suggestive of such a review or that it grasped Filja's serious allegations supporting his ineffective assistance claim. This inadequate explanation does not support the BIA's decision.[8]

_____

[8] The government contends that we should not consider Filja's ineffective assistance of counsel contention because it was not raised in his opening brief. This claim, however, is inextricably intertwined with the substance of the changed country conditions claim. The significance of the Socialist Party's return to power is emphasized by the critical evidence which previous counsel failed to develop. The government has

25

Thus the BIA, because of its mistaken view of the time limits imposed by 8 C.F.R. § 1003.2(c)(3)(ii), did not appear to have considered the record at all when it decided Filja's claim based on changed country conditions. Its decision on Filja's ineffective assistance of counsel claim evidences no analysis of the record and is so deficient it cannot survive review.

C. <u>CAT Claim</u>: Filja's motion to reopen also sought relief under Article 3 of the CAT, which forbids a State Party from forcibly returning a person to a country where there are "substantial grounds for believing that he would be in danger of being subjected to torture." This relief was not available to Filja when he appeared before the IJ on June 28, 1996, as Congress did not pass legislation implementing the United States' obligations under the CAT until 1998 with the Foreign Affairs Reform and Restructuring Act ("FARRA"). <u>See</u> Pub. L. No. 105-227, Div. G., Title XXII, § 2242, 112 Stat. 2681, 2681-822, codified as note to 8 U.S.C. § 1231. Section 2242(b), which substantively implements the CAT, directed "the heads of the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention], subject to any reservations, understandings, declarations, and provisions contained in the United States Senate resolution of ratification of the Convention." <u>See</u> 8 U.S.C. § 1231 note.[9]

Resolving Filja's CAT claim the BIA stated:

_____

had to address this failure throughout the proceedings before the BIA and in this Court. It does not prejudice the government, and consideration of this issue is necessary to provide full justice to the Filjas. <u>See</u>, <u>e.g.</u>, <u>McCarthy v. SEC</u>, 406 F.3d 179, 186 (2d Cir. 2005) ("We are inclined to overlook a party's failure to properly raise an issue on appeal if manifest injustice would otherwise result.").

[9] For a detailed account of the United Nations's adoption of the CAT and its ratification by the United States, see <u>Auguste v. Ridge</u>, 395 F.3d 123 (3d Cir. 2005).

26

We find that respondent has failed to demonstrate prima facie eligibility for protection pursuant to the Convention Against Torture. The evidence of record fails to indicate that it is more likely than not that respondent will face torture upon return to Albania.

The BIA's rationale for this conclusion was that ". . .[Filja's] arguments, in substantial part, consist of the same arguments previously presented in support of his application for asylum and withholding of deportation which were denied both by the Immigration Judge and by the Board." The BIA failed to recognize that the situation in Albania presented to the IJ and considered by the BIA on appeal was transformed dramatically by the 1997 Socialist Party return to power, and that, therefore, Filja's claims for relief had to be reviewed in this new light. Perhaps the BIA's error was a result of its original error in holding that the motion based on changed country conditions was untimely and that, therefore, the evidence submitted in its support need not be considered. On the facts of this case, the BIA's discussion is insufficient, as is the faulty rationale that followed it.

The government argues that, despite any substantive error the BIA may have made when ruling on the CAT claim, the motion to reopen based on that claim was untimely, requiring its dismissal. Specifically, 8 C.F.R. § 208.18(b)(1) states:

> (1) Aliens in proceedings on or after March 22, 1999. An alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999 may apply for withholding of removal under § 208.16(c).[10]

As the government notes, the Filjas were in removal proceedings after March 22, 1999, which continued until the BIA decision of March 19, 2002. The government further notes

_____

[10] Section 208.17(a) governs deferral of removal under the CAT.

27

that the changed country conditions upon which the Filjas rely occurred in June of 1997. The government contends that the delay in applying for CAT relief from March 22, 1999 to October 9, 2003, should bar the Filjas from seeking CAT relief in connection with their motion to reopen.

Neither the regulations nor equitable considerations support the government's position. Legislation implementing the United States's obligations under the CAT was enacted in 1998, after the IJ's June 28, 1996 hearing and after the IJ's June 1997 opinion. Appropriate regulations were adopted thereafter while the Filjas' appeal was pending.

Under 8 C.F.R. § 208.18(b) aliens in removal proceedings after March 22, 1999 may apply for withholding of removal under the CAT. If a CAT application is incorporated in a motion to reopen, the 90-day limit on such motions set forth in 8 C.F.R. § 1003.2(c)(2) is trumped by the changed country conditions provision of subsection (c)(3)(ii).

Thus the BIA's decision on the Filjas' CAT ground for reopening fails to demonstrate that the BIA either reviewed the record or grasped the Filjas' claim. The Filjas were not time-barred from bringing that claim.

## IV. <u>Summary</u>

We review the denial of a motion to reopen for abuse of discretion. INS v. Doherty, 502 U.S. at 323. A denial of a motion to reopen will be overturned only if it is "arbitrary, irrational or contrary to law." Tipu v. INS, 20 F.3d 580, 582 (3d Cir. 1994) (internal quotations omitted). The BIA's holding that the Filjas' claim for relief based on changed country conditions was time-barred is contrary to law. The BIA's decision denying the Filjas' claims for relief based on ineffective assistance of counsel and based on entitlement to relief under the CAT was arbitrary and irrational, and thus an abuse of discretion. It failed to demonstrate any support in the record for its conclusions, and it did not address the serious contentions that the Filjas advanced.

28

## V. __Conclusion__

We grant the Filjas' petition for review and vacate the BIA's February 23, 2004, decision denying the Filjas' motion to reopen. Although the evidence submitted in support of the motion to reopen provides strong support for granting the motion to remand the case to an IJ for consideration of the Filjas' claims for relief in the light of that evidence, this is a determination that the BIA should make in the first instance. Consequently, we will grant the petition and remand the case to the BIA for further proceedings consistent with this opinion.