**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 14-4151, 15-1658, 15-3069
_____

PLAMEN IVKOV AYVAZOV, a/k/a REKIP AYVAZOV,

                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,

                                        Respondent

_____

On Petition for Review of an Order
of the Board of Immigration Appeals
(Agency No. A099-625-882)
Immigration Judge:  Honorable Rosalind K. Malloy

_____

Argued: March 14, 2016

BEFORE: FUENTES,[*] CHAGARES, and RESTREPO, *Circuit Judges*

(Opinion Filed:  October 27, 2016)
_____

Raymond G. Lahoud, Esq.  **[ARGUED]**
Baurkot & Baurkot
227 South 7th Street
Easton, PA 18042

*Counsel for Petitioner*

Eric H. Holder, Jr., Esq.

_____

[*] Honorable Julio M. Fuentes assumed senior status on July 18, 2016.

Thomas W. Hussey, Esq.
Jenny C. Lee, Esq. **[ARGUED]**
John M. McAdams, Jr., Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent*

_____

OPINION<sup>**</sup>

_____

FUENTES, *Circuit Judge*:

Plamen Ayvazov, a citizen of Bulgaria, petitions for review of three orders of the Board of Immigration Appeals ("BIA"). The first order denied his applications for asylum and related relief, while the second and third denied motions to reopen. As explained further below, we will 1) grant in part and deny in part the first petition, 2) grant the second, 3) deny the third, and 4) remand this matter to the BIA for further proceedings.

I.

Ayvazov entered the United States from Mexico in March 2006, along with his brother and his brother's wife (Ayvazov's own wife had earlier entered the United States). He was detained and charged with being inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for lacking proper entry papers.

<sup>**</sup> This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Ayvazov applied for asylum and related relief[1] on the basis of his race, nationality, political opinion, and membership in a particular social group. Identifying his ethnicity as Roma Gypsy, he claimed that he and his family had been severely mistreated by Bulgarian agencies and the country's police force. This mistreatment included ghettoization, beatings, arrests, and denials of employment and access to social services.

In an attached affidavit, Ayvazov identified again as a "Roma Gypsy," explaining that "Roma Gypsies . . . have been historically discriminated against and severely persecuted in our native Bulgaria"[2] and describing both his historical and recent mistreatment in greater detail. For instance, Ayvazov claimed membership in a Roma rights organization, Euroroma, which had been the flashpoint for several of the antagonistic encounters with police. In one 2005 incident, a Euroroma meeting was raided by police officers who dragged Ayvazov to the local police station, beat him, attempted to elicit false confessions to unrelated crimes, and called him a "dirty Gypsy . . . not worthy to live on Earth."[3] After, he was hospitalized, "covered with blood."[4]

Although Ayvazov's applications for relief from removal were filed in 2006, his immigration proceedings did not really begin in earnest until the matter was transferred from California to Philadelphia a few years later. The first hearing of significance took

[1] As Ayvazov has explicitly abandoned his withholding of removal and Convention Against Torture claims, *see* Ayvazov Br., C.A. No. 14-4151, at 24, we will discuss only his application for asylum.

[2] Administrative Record (A.R.) 959. All record citations are to the administrative record in C.A. No. 15-3069, as it is the most comprehensive of the three.

[3] A.R. 960.

[4] A.R. 960.

3

place in July 2010, and was mostly dedicated to sorting out the evidence, which included his Euroroma membership card, pictures showing the scars from the injuries he sustained in his police encounters, and the affidavit that had accompanied his asylum application. Due in part to issues with the form of Ayvazov's evidence packet, the presiding Immigration Judge ("IJ") explained to Ayvazov and his attorney that the matter would need to be put over to the next available hearing date, which she anticipated would be in about a year's time.[5]

But before that July 2010 date drew to a close, the IJ flagged an issue: Ayvazov's ethnicity. Noting that "anyone can walk in and say . . . I'm a Roma," the IJ said that she would "really like to make sure" that Ayvazov was in fact Roma, alluding to one or more previous cases she had heard involving dubious claims of Roma ethnicity.[6] At this time, the IJ did not comment extensively on how Ayvazov might go about establishing his Roma ethnicity, although she did appear to accept that his name might reflect a Roma background.[7]

The IJ's scheduling prediction turned out to be optimistic: the next hearing date was more than two years later, in November 2012. And as it began, the IJ remarked, incorrectly, that the prior hearing had ended early because "there was no evidence of [Ayvazov's] ethnicity."[8] Returning to the issue of ethnicity a few moments later, the IJ

---

[5] *See* A.R. 608.
[6] A.R. 603.
[7] *See* A.R. 604.
[8] A.R. 619.

said she would "bet if [she] were to replay the tape [of the July 2010 hearing], the tape would reveal the same thing I'm saying today[: Ayvazov] has not submitted any evidence that he's a member of the persecuted group."[9]  The IJ asked if Ayvazov could "find some kind of expert . . . to tell us . . . what his ethnicity is" because that would "certainly . . . help his case."[10]  The participation of an "expert" arose again a few minutes later, when the IJ proposed taking Ayvazov's testimony right away so that there would be ample time to "get the expert's testimony at the next hearing [date]."[11]

Before the start of Ayvazov's testimony, the IJ again admitted evidence into the record.  Addressing Ayvazov's attorney, the IJ characterized the proffer as "overwhelming evidence that Romas are targeted, Romas have a problem in Bulgaria . . . but not one iota of evidence that the respondent is in fact a Roma.  . . . We have sufficient evidence to show that . . . Romas are not a group that's welcomed in Bulgaria."[12]

Ayvazov's hearing testimony focused on many of the same incidents addressed in his earlier affidavit.  He again spoke about his Roma ethnicity and his participation in Euroroma, explaining that he was identifiable as Roma in Bulgaria by his manner of dress, skin tone, and home address in a Roma ghetto.  On cross, the government probed inconsistencies in his story, pertaining to the extent of his injuries—Ayvazov blamed

---

[9] A.R. 625.

[10] A.R. 625–26.

[11] A.R. 628–29.

[12] A.R. 634.

discrepancies between his oral testimony and a medical report on "corruption"[13]—whether he had completed his schooling in Bulgaria, and so on.

After Ayvazov finished testifying, the IJ informed the parties that she was scheduling an additional hearing date for December 18, a month and a half later. The IJ described this date as Ayvazov's deadline to "find an expert on Roma" and provide details of the expert's availability to testify and his or her CV.[14] Ayvazov was advised to "start [his search] with universities that have area studies."[15] There appears to have been no discussion of any alternative means by which Ayvazov could satisfactorily corroborate his ethnicity.

When the parties reconvened on December 18, Ayvazov's counsel explained to the IJ that he and his client had been unable to find an expert witness; leads at Philadelphia's La Salle University and a school in Texas had not panned out or had otherwise not appeared "helpful," and other potential experts were nervous about testifying.[16] The IJ interpreted this to mean that there was "no one available" to testify about Ayvazov's ethnicity.[17]

In a March 2013 oral decision, the IJ denied Ayvazov's applications for relief from removal. The IJ's analysis focused on Ayvazov's ethnicity, to the exclusion of those parts of his claim that were based on political opinion and social group

---

[13] A.R. 704.
[14] A.R. 716–19.
[15] A.R. 719.
[16] A.R. 723–25.
[17] A.R. 727.

membership. To that end, while the IJ explicitly found "overwhelming evidence" of Bulgarian persecution of Roma that would qualify "many Roma . . . for asylum," she concluded that Ayvazov had failed to corroborate his ethnicity, affording the Euroroma card diminished weight because it had not been authenticated.[18] The IJ separately decided that the inconsistencies in his testimony, in tandem with "the lack of evidence regarding his ethnicity," merited an adverse credibility determination.[19] Somewhat significantly, the IJ's opinion suggested for the first time that written or oral testimony from Ayvazov's wife and brother might have sufficed to corroborate his ethnicity.

The BIA dismissed Ayvazov's appeal, deciding that he had not testified credibly "to establish his Roma ethnicity" and had not met his burden to show persecution on that or any other ground.[20] In so concluding, the BIA upheld the IJ's adverse credibility determination, which it characterized as being based on "specific and cogent reasons"—chiefly, the inconsistencies between Ayvazov's hearing testimony and the medical exhibits.[21] Turning to corroboration, the BIA held both that Ayvazov "did not submit [or] adequately explain . . . the absence of . . . statements from his wife or brother . . . in order to corroborate [his] ethnicity or the alleged past harm" and that affording limited weight to the Euroroma card was proper (because it had not been authenticated).[22] Although Ayvazov had been "given an opportunity" to present an expert, the BIA noted

---

[18] A.R. 525.
[19] A.R. 527.
[20] A.R. 450.
[21] A.R. 451.
[22] A.R. 452.

that he had not done so.[23]  With the assistance of new counsel, Ayvazov timely petitioned for review of the BIA's decision (C.A. No. 14-4151).

Ayvazov then timely moved to reopen proceedings before the BIA on the basis of two new exhibits.  The first was a report from one Dr. Eiden Perushko, an expert who resides in England.  Dr. Perushko both commented on conditions for Roma in Bulgaria and corroborated Ayvazov's claim of Roma ethnicity.  The second exhibit was an affidavit from Ayvazov's wife, who also corroborated his Roma ethnicity while claiming that his attorney had advised her not to testify because she lacked immigration status.

The BIA denied reopening on two grounds.  First, the BIA decided that the mistreatment discussed in Dr. Perushko's report did not rise to the level of persecution. Second, the BIA held that information on country conditions in Bulgaria did not amount to newly available evidence, as it could have been obtained prior to the 2013 hearing. Animating both parts of the BIA's decision was a suggestion that Dr. Perushko's report contained only background information showing the "generally adverse conditions faced by the Roma population in Bulgaria."[24]  The BIA made no mention of the report's discussion of Ayvazov's ethnicity, or otherwise of his wife's separate affidavit.  Ayvazov petitioned for review of this decision (C.A. No. 15-1658).

Finally, Ayvazov filed another motion to reopen predicated on ineffective assistance of prior counsel.  The motion set forth, in part, previous counsel's efforts to

---

[23] A.R. 452.

[24] A.R. 367.

find documents or witnesses to corroborate Ayvazov's ethnicity—efforts that switched to finding an expert witness after the November 2012 hearing. The BIA denied reopening as time- and number-barred and otherwise without merit. A third petition for review followed (C.A. No. 15-3069).

We consolidated the three petitions for review. They have been fully briefed and are ready to be decided.

II.[25]

Because they present related issues, we address the first and second petitions for review together. Bearing in mind that our task is to review the rationale actually provided by the agency,[26] we conclude that the first petition should be granted in part and the second granted in its entirety.

We begin by observing that the IJ explicitly found "overwhelming evidence" that "Roma are indeed targeted for persecution in Bulgaria."[27] This finding, which has never been disturbed, is of no small importance, as it suggests that even if the IJ did not fully credit Ayvazov's story of past persecution, she might yet have granted his asylum claim

---

[25] We have jurisdiction to review the BIA's orders under 8 U.S.C. § 1252(a)(1). Factual findings, including adverse credibility determinations, are reviewed for substantial evidence. *Shardar v. Ashcroft*, 382 F.3d 318, 323 (3d Cir. 2004). We review the BIA's written decisions except to the extent that they defer to or adopt the IJ's analysis. *Calla-Collado v. Att'y Gen.*, 663 F.3d 680, 683 (3d Cir. 2011) (per curiam). Petitions arising from motions to reopen are reviewed under a deferential abuse-of-discretion standard. *Filja v. Gonzales*, 447 F.3d 241, 251 (3d Cir. 2006).

[26] *Konan v. Att'y Gen.*, 432 F.3d 497, 501 (3d Cir. 2005).

[27] A.R. 525.

9

based on a well-founded fear of future persecution.[28]  She also found, however, that

Ayvazov had not adequately corroborated his Roma ethnicity—a finding upheld by the

BIA.[29]

While an alien, regardless of credibility, can be required to corroborate elements

of his or her story,[30] we agree with Ayvazov that the process went awry here.  The BIA

suggested that it was within Ayvazov's power to corroborate using "statements from his

wife or his brother,"[31] but as shown in the recitation above, he was told by the IJ that

expert testimony would be required; the possibility of satisfying the IJ's request for

corroboration using his wife or brother did not arise until after the IJ had rendered her

decision.  This does not substantially conform with the three-step process for

corroboration that we have articulated in cases like *Abdulai v. Ashcroft*.[32]

We further think it improper as an independent matter, even outside of the *Abdulai*

framework, to require an alien to corroborate his or her ethnicity using expert testimony,

---

[28] *See Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 590 (3d Cir. 2011).

[29] We note that the agency's decisions on credibility and corroboration are somewhat entangled, *see Toure v. Att'y Gen.*, 443 F.3d 310, 323 (3d Cir. 2006), but we endeavor to keep them distinct; however, this should be addressed on remand.

[30] *See* 8 U.S.C. § 1158(b)(1)(B)(ii).

[31] A.R. 452.

[32] 239 F.3d 542, 551–52 (3d Cir. 2001).  As a related matter, the BIA upheld the IJ's decision to give the Euroroma card little weight because it was not authenticated.  The BIA's citation of our decision in *Chen v. Gonzalez*, 434 F.3d 212, 218 n.6 (3d Cir. 2005), suggests that the agency thought that the card needed to be authenticated pursuant to 8 C.F.R. § 287.6 or § 1287.6.  However, those regulations apply only to "official records." *Lin v. Att'y Gen.*, 700 F.3d 683, 686–87 (3d Cir. 2012).  It is unclear whether a card showing membership in a political organization, *see* A.R. 656, would need to be so authenticated.  The BIA may make such an initial determination or clarification on remand.

except in truly extraordinary circumstances. Acquiring the services of an expert, especially on short notice (arguably the case here, given the month that passed between the two 2012 hearing dates) or for clients of limited means, is not a minor undertaking. Instructing counsel to blanket the local university campuses during the holiday season is far from guaranteed to yield reliable sources willing and able to testify.

In moving to reopen, Ayvazov tried to remediate the lack of corroboration by providing Dr. Perushko's expert report and an affidavit from his wife. While the BIA's decision on reopening is entitled to extensive deference, we think it missed the mark. The agency held that the information in these exhibits was previously available, yet did so entirely on the basis of the background country conditions in the report. The BIA did not comment on the report's discussion of Ayvazov's Roma ethnicity or otherwise determine, in light of the procedural problems affecting the earlier corroboration process, that *this* information should or should not have been previously available.

The BIA offered another ground for denying reopening: the new evidence would not have made any difference, because Ayvazov had failed to establish a prima facie case for the relief sought.[33] As discussed above, the agency failed to reach the truly material part of the new submissions. In fact, it went further, deciding that the report failed to show persecution of the Roma in Bulgaria. But as the BIA never had reason to reach, much less repudiate, the IJ's previous decision that country conditions in Bulgaria *did* appear to show persecution of those of Roma ethnicity, we agree with Ayvazov that this

---

[33] *See Lin*, 700 F.3d at 686.

factfinding was improper.[34]  Since we are limited to reviewing the agency's explanation of its decision, this counsels in favor of granting the petition.

In sum, we conclude that the BIA's original merits decision was flawed inasmuch as it both independently and by incorporation reflected an erroneous corroboration determination, and that the BIA's decision on reopening missed the actual claim that Ayvazov was attempting to advance.  Accordingly, the first petition will be granted in part,[35] and the second granted in its entirety.

## III.

Ayvazov's second motion to reopen was premised on ineffective assistance of counsel.  His petition for review from the BIA's decision denying it, however, appears to rehash many of the same arguments from his second petition for review.  We see no reason to disturb the BIA's order denying the second motion to reopen, and will accordingly deny the third petition for review.

## IV.

For the reasons set forth above, we will grant the petitions in part.  The matter will be remanded to the BIA for further proceedings consistent with this opinion.

---

[34] *See* Ayvazov Br., C.A. No. 15-1658, at 15–16; *see also* 8 C.F.R. § 1003.1(d)(3)(iv) (prohibiting the BIA from engaging in factfinding on appeal); *Kaplun v. Att'y Gen.*, 602 F.3d 260, 272 (3d Cir. 2010) (noting that BIA must review IJ findings of fact under a clearly erroneous standard).  We observe that the IJ incorrectly advised Ayvazov that he could present expert testimony for the first time on appeal.

[35] Because it was intertwined with corroboration, we do not reach Ayvazov's credibility at this time, although the agency can freely reexamine the matter on remand.  The agency's ultimate decision regarding credibility can be raised in a future petition for review to this Court, if it is necessary to do so.